## THE ALCAZAR.

(District Court, E. D. North Carolina. October 11, 1915.)

### No. 126

1. SALVAGE ⊜⇒17—NATURE OF SERVICE—SUCCESS OF EFFORTS.

A tug, at the request of a steamship stranded on a shoal off the North Carolina coast, stood by for several hours in a heavy sea, taking off the crew because, after the steamer had been forced off the shoal by the wind and waves, she had a 45 degree list, and was unmanageable, which in the opinion of both officers and crew rendered it very dangerous to stay on board. Early the next morning the tug undertook to tow the steamer to port, but owing to the heavy wind and sea was unable to make much headway, and about noon cut the hawser and took the crew to Wilmington, and after obtaining coal and supplies went back to look for her, but she had been taken in charge by another vessel, and the tug did not find her. *Held* that, while the service did not result in saving the steamer, she was in undoubted peril, and the service left her in less dangerous case, and probably, although not certainly, contributed to her safety and was entitled to compensation as a salvage service.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. § 30; Dec. Dig. ⊜⇒17.]

2. SALVAGE ⊜⇒21—NATURE AND SUCCESS OF SERVICE—SALVING OF QUASI DERELICT.

The passenger steamer Dorchester, on her trip from Savannah to Philadelphia, in December, off the North Carolina coast, at night, and in rough weather, came upon the Canadian steamship Alcazar, with no one on board, without steam or lights, and having a list of 40 to 45 degrees. After 45 hours' work with the assistance of a sister vessel, which came along, and later of a government vessel, which she called by wireless, the Dorchester got the Alcazar anchored in Lookout Bight, which was the nearest place of refuge. In the course of operations, however, the Alcazar was anchored, and owing to unfamiliarity with the English anchor hoisting mechanism, both bow anchors were unintentionally dropped, and when she was again moved it became necessary to slip both anchors, so that when she reached the Bight there was only a kedge anchor, the flukes of which were rusted or "frozen" and failed to open when the anchor was dropped. In stormy weather following the vessel dragged this anchor and stranded on a shoal in the Bight. The Dorchester had no knowledge of the ownership of the Alcazar, and left men on board with instructions to allow no one to come on board without showing authority. The next day a representative of the owner, having learned her position, came out to her, but was refused permission to come on board, and during the ensuing delay a severe storm drove the vessel further on the shoal. Claimant defended against the suit for salvage on the ground that the service was negligently performed in losing the anchors and failing to inspect and put in proper condition the kedge anchor, and that the salvors wrongfully withheld possession. *Held*, that the Dorchester was justified in regarding and treating the Alcazar as a derelict, although she was not strictly such, her crew having abandoned her only temporarily because of her dangerous condition, that

the salvage service rendered was meritorious, and that the matters urged in defense went only to the question of the amount of compensation to be awarded.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 48–51; Dec. Dig. ☜21.]

3. SALVAGE ☜4—"DERELICT"—WHAT CONSTITUTES—"QUASI DERELICT."

A vessel found at sea in a situation of peril, with no one aboard of her, is prima facie a "derelict"; but when the crew have left her temporarily, with the intention of returning to resume possession, she is' not technically a derelict, but is what may be termed a "quasi derelict."

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 7–11; Dec. Dig. ☜4.

For other definitions, see Words and Phrases, First and Second Series, Derelict.]

4. SALVAGE ☜41—DERELICT—SURRENDER OF POSSESSION.

The lien of the salvor of a derelict is not lost by surrender of possession, and unless there is a probability that before process can issue and be served the property will be removed beyond the jurisdiction, or to a place rendering the enforcement of the lien more difficult or expensive, possession should be surrendered to the owner on demand, at least to the extent of permitting him to come on the vessel and aid in taking care of her.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. § 106; Dec. Dig. ☜41.]

5. SALVAGE ☜28—AMOUNT OF COMPENSATION—QUASI DERELICT.

The amount of compensation to which salvors of a steamship, found abandoned at sea and which was a quasi derelict, were entitled, considered, and determined on the evidence.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 69, 71; Dec. Dig. ☜28.

Salvage awards in federal courts, see note to The Lamington, 30 C. C. A. 280.]

In Admiralty. Suits for salvage by the Merchants' & Miners' Transportation Company, and by Rufus S. Salas and Thomas B. Starratt, against the steamship Alcazar; the Inter-American Steamship Company, Limited, claimant. Decrees for libelants.

Libels were filed by the Merchants' & Miners' Transportation Company, owners of the Dorchester and the Merrimac, and Rufus S. Salas, owner of the steam tug Columbia, and Thos. B. Starratt, master, against the steamship Alcazar, for salvage service. The libels were consolidated and heard together. Several members of the crew of the Alcazar filed intervening libels.

· Daniel H. Hayne, of Baltimore, Md., and J. O. Carr, of Wilmington, N. C., for libelants.

Harrington, Bigham & Englar, of New York City, and Chas. L. Abernethy, of Newbern, N. C., for claimants.

Lawton & Cunningham, of Savannah, Ga., for The Columbia.

CONNOR, District Judge. The Alcazar, a tramp steamer, owned by claimant, Inter-American Steamship Company, Limited, a Canadian corporation, leaving Port-au-Paix, Haiti, with a cargo of logwood, or dyewood, December 18, 1912, destined for Chester, Pa., went on a

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

shoal, on the North Carolina coast, "just inside the Knuckle Buoy, between Cape Lookout and Cape Lookout Lightship," at about 1:55 p. m., December 23, 1912. Her dimensions are: Length, 322 feet; beam, 41.5 feet; depth, 20.7 feet; register, 3,129 tons gross, 2,020 tons net. Her draft, loaded, 18 feet 2 inches. Her crew consisted of captain and 25 men. Cargo, 2,800 tons. Built 1893.

The Columbia, owned by libelant Rufus S. Salas, left Savannah, Ga., December 21, 1912, with a tow, on a voyage to Norfolk, Va. She dropped her tow off Charleston, S. C. Her dimensions are: Length, 101 feet; beam, 23 feet; draft, 14 feet; steel, fore and aft compound engine 500 horse power; built 1904. On December 23, 1912, she was off Cape Lookout. Crew, captain and nine men. About one-half hour after the Alcazar went on the shoal, she called the Columbia to stand by her. Garrod, master of the Alcazar, says that the Columbia came as near to him as she could get; tried to shout through the megaphone, but master could not hear—wind was blowing. Starratt, master of the Columbia, says that the Alcazar tried to hail, but could not understand; wind was blowing too hard; sent up signals; wished to communicate; signaled to send boat; sounding showed that where he was had 20 feet water; his tug was drawing 14 feet; went as near as he thought safe; thought that he was putting his boat in danger; sea was heavy, choppy, breaking from northeast; boat came from the Alcazar with captain and five sailors; came aboard the tug; thought it best to stand by and get hold as soon as we could; if she floated, to take a line; and, if she was damaged in any way, to tow her to the nearest port. Garrod says:

"I asked him to stand by, and he said he would. I was preparing to come aboard [the Alcazar] again, when the lifeboat was smashed. It was our own lifeboat."

The Columbia "stood by all the time and we saw the steamer come off the shoal." The Alcazar, without assistance, came off the shoal about 6 o'clock, the wind was about northeast and aided her in getting off. After getting off the shoal, the Alcazar began to list—between 40 and 45 degrees, port. The crew on board blew whistles and fired rockets— distress signals. The master of the Alcazar says:

"I got as close to the ship as I could with the tug, and the men were all shouting; they sent rockets up. We got as close as we could and took them off, and then I asked the tug to stand by until daylight to see what she was going to be like."

The other members of the crew of the Alcazar reached the Columbia at about 7 o'clock. Garrod says that, at the time he left the Alcazar, it was not his intention to abandon the ship; "only to come off for fear she would turn over; waiting to see what she would be like. It was coming on dark at that time; it was dangerous enough at that time of night." All of the crew came to the tug on the same boat, making three trips. On cross-examination, he says that the crew left "because she lay over that far that men had to leave." Did not consider it safe; left in a hurry; afraid that she would turn turtle. Sea was increasing all of the time. He was asked whether any one, who would stay on a vessel of that character, would be taking his life in his hands, to which he answered:

"Yes; he would be thinking about committing suicide; it would be a very hazardous thing to do. Some of the crew said that they did not think they would return; came off to save our lives; expected to capsize at any minute; grabbed our clothes best we could; all glad to get away; did not know what they intended to do."

There is much contradictory evidence respecting the articles brought to the Columbia by the crew of the Alcazar, which will be hereafter noted. The sea was quite heavy from the northeast at 7 o'clock; moderated to calm later on. The next morning, at about 3:30 o'clock, six of the crew of the Alcazar, under the direction of the captain of the Columbia, took a line to the Alcazar, for which he paid each of them $5, attached it to a hawser furnished by the Columbia, and began towing the Alcazar. After coming off the shoal, she had drifted with the current to the westward, and with the wind to the southeast. Shortly after the tow line was attached to her, the wind began to blow from the southwest. Garrod says:

"They had hold of the ship, towing her against the wind, but the wind was too strong. We made no headway; hardly any headway at all. This continued until about 7:30 a. m., making two or three miles. The wind then blew to the southwest. The tug changed her course westward, to keep from being blown to sea; held this course until 12:30 p. m. There was then a strong gale; held this westward course to keep from being blown to sea, to try to keep as close to the shore as possible; then cut the hawser. She was then approximately 8 or 10 miles southward of the lightship; well and clear of Cape Lookout shoals; wind blowing approximately west-northwest; cut the hawser, because weather conditions were such as were unsafe for the tug or crew, or the crew of the Alcazar, to remain in that position any longer. The sea was breaking over the tug."

The master of the Alcazar says that the reason given by the master of the Columbia for cutting the hawser and leaving the ship was that she "wanted more coal"; that she did not have sufficient coal to continue her operations then. The master of the Columbia denies this; says that he had, when he left Savannah, 110 tons, and when he left the Alcazar he had 55 or 60 tons, enough to last three days; that he may have stated that he would take coal supplies when he reached Wilmington. He assigns as his reason for not continuing the work that, with the coming of 26 additional men on board from the Alcazar, he did not have a sufficient supply of provisions. He was nearer to Beaufort than Wilmington, but knew nothing of the conditions at Beaufort—had no chart for that harbor. It was his purpose to go to Wilmington, take on stores and coal, and return to look for the Alcazar. He arrived at Wilmington about noon of December 25th. While going up the river, he met the revenue cutter Seminole; shouted to her captain, asking if he was going to the Alcazar; said he was going to search for her. The captain of the Columbia landed the crew of the Alcazar at Wilmington, took on coal and stores, and that evening left for the purpose of looking for the Alcazar; searched for her from 6 in the morning until 4 o'clock in the afternoon, at the place where he supposed she would be. Not finding her, he continued his trip to Norfolk. He says that he told the men on the Seminole, as he passed, that he was going back to look for the Alcazar. He did not know, positively, that the Seminole was going out to look for her, but supposed so; heard, when he got to Wilming-

ton, that she had gone out to look for a steamer; knew that it was the Alcazar. He was engaged in standing by the Alcazar from 2 o'clock p. m., December 23d, until 7:30 a. m., December 24th; in towing her from that time until 12:30 p. m. For the purpose of taking her crew into Wilmington, and taking on a supply of provisions and coal and searching for the steamer, the tug was detained until 4 o'clock p. m. of December 26th. She lost a hawser, worth $391.23; consumed 50¾ tons of steam coal, $233.38; furnished provisions, $86.02; paid crew of Alcazar to take line to her, $25; charges for three days, $300; aggregating $1,033.63.

H. S. Chase, master of the Dorchester, owned by the Merchants' & Miners' Transportation Company, on her trip from Savannah to Philadelphia, says that at 9:25 p. m., December 24, 1912, his attention was called to "something on the starboard bow." He slowed the ship down, ported the wheel, and swung around on the starboard side of the object, and with glass and searchlight made it out to be a steamer, with a deck load. He thus describes the situation and the course pursued by him:

"She was laying over very dangerously. I came on by the ship until I circled around and turned the light on the name, and saw she was the Alcazar, and stopped the ship close to the Alcazar and looked her over. I was possibly 25 yards [away from her]. It was rough, and both ships were rolling badly. I told the mate it was a prize there, and it looked to be in pretty bad shape: * * * and I said, 'I would like for you to go aboard of her, but I would not order you to go aboard, but would be glad if you would go.' He took a volunteer crew of five men in a small boat, and I got him clear of the ship, and he rowed to the Alcazar. The men were very scared, and I heard them talking and shouting. They were gone possibly half an hour, and came back. The mate came on deck and said he could do nothing with those men, and the men said themselves they would not risk their lives to go on that vessel. The mate said, if he could get a volunteer crew, he would try again."

The men were called up; none of the sailors would go; the pantryman, the second cook, and two waiters and several others offered to go. They went with the mate. The towing hawser of the Dorchester, 90 fathoms, 8-inch manilla, was gotten out.

J. G. Beranger, the mate, who went with the crew, after describing the first effort to get on the Alcazar, and the refusal of the men to do so, and their return to the ship, describes the second effort, saying:

"She was surfing 12 or 15 feet high. * * * We got started, and had about the same difficulty as on our previous trip, getting away from the ship's side. The little boat was tossing very heavily, and there was danger of falling overboard, and we had about as much trouble getting alongside as before. However, I got the bow of the boat about 25 feet from the stern, when we boarded her, and the boatswain was the first man to get aboard, and he grabbed the rail, and went aboard as she came down, and fell inside."

He describes how each of his crew, by the same method, got on the vessel. He says that he went on and placed the quartermaster in charge, etc. He describes the difficulty which they had in securing a position on the vessel and putting on the hawser. They finally succeeded, and called to Capt. Chase to go ahead. Chase says:

"With great difficulty we gave a line to the Alcazar, and he got one or two more men, and they got up on the bow and hauled the heaving line aboard, and I got my hawser through the starboard bow chock, and he hauled it in,

possibly 10 fathoms of it, and made it fast, and said he had her all right. Owing to the sea, which was heavy, and the vessel acting badly, my own vessel acted very badly, and the Alcazar going up and down 10 or 15 feet, I did not dare start with my ship towing the Alcazar, with any men on her, and I called them back. They came back, and we secured our boat, and started ahead very slowly, and before going ahead I told the chief officer that we were up against a dangerous proposition, and I wanted him to instruct his men not to make any mistakes, because one single mistake with the engine meant the destruction of both vessels. Or course, handling a ship like that at night is an ugly business, especially backing and filling. The men worked very nicely then. I made the hawser fast, and the Dorchester started to towing the Alcazar. We did not do much on it, because she took charge of us, and not us of her. She persisted in going around in a circle, no matter what I did with the Dorchester's engine or wheel. Instead of going towards the land, as I wanted to go, she persisted in going the other way. For half or three quarters of an hour, the Alcazar was sheering, sometimes almost abreast of the ship, and the hawser coming up in the sea, and after an extraordinary sheer the hawser parted, with 40 fathoms from the Alcazar and about 30 fathoms from us. While we were doing this, the Merrimac, one of our own ships, came up, winked his eye at us, and, as I had no other hawser then for that purpose, I wirelessed the Merrimac to come back, and he came back about half past 2, and we held a consultation, and I told the captain of the Merrimac that we had an abandoned steamer here, and did he have any towing hawser, and he said he had about 120 fathoms of 10-inch manilla."

They decided to do no more that night, to wait for the sea to go down.

"The Alcazar was free, and I took the bearing of the ship. She was 7 miles southwest and ½ west from Lookout Lightship, and I watched her from 2 o'clock."

He indicated on the chart her location. She moved about half a mile, drifted an hour in a northeast direction.

"When morning came we discovered what the trouble was with the Alcazar, in regard to swinging us around in that circle. We found she was about 2½ feet down by the head, and her rudder was jammed hard over port."

He gave directions to the mate and his crew, who went to the Alcazar, in regard to straightening out the rudder. This was done by going below to examine the gear around the rudder. He says:

"I would not have gone below for the whole vessel; under those circumstances, because, if she capsized, he would never have gotten out, and nobody knew it was not going to capsize."

The captain of the Merrimac sent a boat with a second officer and five men, and they put one more man on the Alcazar, and with this boat he sent a small 2½-inch manilla rope, and on this he bent his 10-inch hawser and got it fastened in the same position it had been fastened on the night previous. After getting the hawser fastened, as described by Chase, he—

"headed north-northeast, which was about the direction we had to go to clear the shoal, and, after towing possibly half an hour or more, the Alcazar doing the same trick with him as she did with me, sheering first one way and then another, then the line went in the air and parted about two fathoms of the bridle. There was the Alcazar free again, with this 10-inch hawser hanging down from her bow."

Chase describes his efforts to pick up the hawser, saying:

"I had to back my ship towards the Alcazar; my ship was rolling one way and she was rolling the other. I don't know whether any of these gentlemen have ever been masters of vessels; but if you have a vessel worth $300,000 and about 60 or 70 people, all under you, on that boat, and if you succeed in a thing like this, you get greatly praised, but you know what you get if you fail. * * * We were gradually drawing up around the end of the shoal, and I could see the top of the Life Saving Station. I was trying to get her into Lookout Bight, if I could; but about 3 o'clock the new hawser, which belonged to the Merrimac, parted, and it left me about 60 fathoms out of the 120 which we had in the morning. My crew was fagged out, they had been up since the night before, and with part of the Alcazar it didn't look very good about getting her in, and the Merrimac came there and said: 'If you will run a line, I will tow her.' It was getting dark then, and we had to do what we had to do, quick."

While he was engaged in this effort, Yeomans, of the Life Saving Service, came to him in a gasoline boat. He undertook to pilot the Dorchester, having the Alcazar in tow, and finally got her in the Bight within about 4½ miles of the light, and he said that would be all right. When they got in the position Mr. Yeomans said was all right, told him to let go the anchor and hawsers. In letting go the anchor, both sides were unlocked, instead of one; was not familiar with the English anchor; "so there she was with two anchors."

Chase, in the meantime, had sent a wireless to the captain of the Seminole, revenue cutter, at Wilmington. He brought the Dorchester nearer to the Alcazar, to carry the men from the Dorchester, who had been on her during the time, something to eat. While on the Alcazar, the Seminole came up and steamed to the Dorchester. After looking after his men on the Alcazar, he went to the Seminole and there met Lieut. Covell, the officer in charge, told him who he was, and that he wanted him to take the Alcazar into Lookout Bight. After discussing the weather, he proposed to start early in the morning. Chase then went to Beaufort for the purpose of communicating with his people, spent the night there, December 25th, returned next morning. The Seminole, at Wilmington, received a wireless from the Dorchester on the morning of December 25th, stating that she was standing by the Alcazar, 7 miles southwest of Lookout Light Vessel. Covell, her first lieutenant, in command, started at once to give assistance. At 2 p. m. of the same day he received a message from the steamer Merrimac, stating that the Dorchester and she were accompanying the Alcazar toward Lookout Bight, the weather was good, very little wind, and smooth sea. Lieut. Covell says that, when he reached the Dorchester, Capt. Chase was on the Alcazar. He soon came alongside the Seminole in the Life Saving boat, and said that the Alcazar had been anchored by him in her present position and wished him to tow her into Lookout Bight. He went on the Alcazar, taking his carpenter with him; looked over the situation, and found both anchors down, and, in order to take her into the Bight, they slipped both chains. Before doing so, talked with the five men on board, the prize crew from the Dorchester; no protest was made; had no means of getting the anchors up; started with her at 3:45 a. m. on December 26th; anchored her in the Bight with a kedge

anchor, which was on her forward bow. There was one small kedge on the starboard bow; used the heavier kedge. While they were trying to get the anchor off, she drifted in on Cat Fish Point. They pulled her off; stood by her all that night, and left the morning of the 27th December; left several members of the Dorchester's crew on her. There was no safer anchorage in the Bight. One anchor would have held her under those conditions. He says:

"It is the safest place in that vicinity, and is considered a safe harbor in everything but a southwestern, which blows into the Bight. In a southwest gale, there is danger of her dragging ashore."

He says that while he was towing her into the Bight the Alcazar sheered—on account of her list and the fact that her steering apparatus was not used—she sheered all she could.

Returning to Capt. Chase's testimony, he says that the Merrimac left him at 6:10 p. m. December 25th; that the prize crew, consisting of four men from the Dorchester, went upon the Alcazar, and—

"I gave them instruction under no circumstances to allow any one aboard that ship, except the life saving crew, and the cutter people, until some one came from our company down there and he knew them, and then he could turn the vessel over to them. Then my ship was anchored about two miles outside of this Bight. I proceeded to Philadelphia short of two licensed men and two other men."

He took from the Alcazar mail packages, which were delivered to the post office, etc. He says:

"From the first time I was notified at 9:25, December 24, 1912, and by the time I got my ship back to the same place she was before, to my original course on my way to Philadelphia, it was 6 o'clock on December 26th—44½ or 45 hours."

It was very cold. The foregoing constitutes the outlines of the transaction, up to the time the Dorchester left the Alcazar, as narrated by the principal actors. Other persons on the vessels engaged were examined at much length. The other incidents occurring prior to December 27, 1912, in regard to which controversies have arisen, will be noticed in the discussion of these questions.

In respect to the events subsequent to the morning of December 27th, giving rise to serious differences between the parties and counsel, dates are of special interest. The libelants claim that when anchored in Lookout Bight, on the afternoon of December 26, 1912, the vessel was in the safest available place, and that they had performed a complete salvage service. This is seriously contested by the claimant. On December 26th, the Merchants' & Miners' Transportation Company of Baltimore, having been notified by Chase of the Dorchester's situation with reference to the Alcazar, wired Marwood & Co., Liverpool, England, stating that their steamer had—

"picked up abandoned steamer Alcazar off Carolina coast. Advise us name owner's representatives in America."

On December 27th, at 9:43 a. m,. they received answer:

"Owners Alcazar. Late Eva—Inter-American Co., Toronto, Canada."

Mr. Hassler, the treasurer of claimant company, residing in New York, on December 25th, learned through the shipping news in the New York Herald that the Alcazar was in distress somewhere below Cape Lookout Lighthouse. He immediately communicated with the Treasury Department at Washington, and learned, through the Department, that the Seminole was in communication with, or had knowledge of, the whereabouts of the vessel. Together with his marine superintendent, Mr. Davies, he came at once to Beaufort, N. C., reaching there December 27th, and endeavored, without success, to get some one to take him to Cape Lookout. He learned, through Mr. Sprunt, at Wilmington, that the captain, second officer, engineers, and two or three of the crew of the Alcazar, had left there for Beaufort. They arrived that afternoon. He secured, on December 28th, a boat, and, with Mr. Davies and the members of the crew, reached the Alcázar during that morning. He found Chamberlain and the other members of the prize crew on board. He describes the appearance of Chamberlain; says that he had a gun laying on the rail. He tried to talk with him and explain that he was the owner of the vessel and wished to go on her, but he would not allow him to go up; told him that he had some telegrams to show that he was the owner, said that he could send them up in a canvas bucket; that Chamberlain was very rude to him; told him in a very impolite way that there was no use in his staying there; that Capt. Chase was his captain; had his hand on his gun. In regard to this conversation. Chamberlain says that he was left in charge of the ship, with instructions not to permit any one to come aboard unless they showed that they were authorized to do so; that some men, on Saturday morning, came on a small fishing boat; one of them wanted to come on, and said that he had a telegram showing his authority; that he told him to send it up in the canvas bucket, which he refused to do, and left.

That Mr. Hassler asked permission to go on the vessel, and that Mr. Chamberlain refused him, is not open to debate. A correspondence over the phone and by wire was conducted between counsel in Baltimore and New York, during the 27th and 28th of December, trying to arrange about a bond, etc. Sunday, the 29th, intervened, and other causes prevented an understanding. Mr. Hassler returned to Beaufort. The libel by the Merchants' & Miners' Company was filed on the 30th of December, and bond filed by claimant. The libel was not filed by Salas until January 7, 1913. On Tuesday, December 31, 1912, Mr. Hassler and his men went on board, and, with the consent of the representatives of the libelant, remained there. In consequence of a controversy about the form of the receipt, it was not signed, nor the vessel and cargo turned over to him, until January 1, 1913. The receipt acknowledged that the claimant had "this day taken possession of said steamer and cargo, as she lies." On the 31st of December, by the consent of Chamberlain, the engineers got up steam in the main boiler of the Alcazar.

In view of the contentions made by the claimant in regard to her condition on December 28th, it is necessary to examine the evidence regarding the manner in which the anchors on the Alcazar were

227 F.—41

dropped and the place at which she was anchored in Lookout Bight. There does not appear to be any controversy in regard to the fact that, after the Alcazar came off the shoal on December 23d, she listed very heavily—at an angle of 40 to 45 degrees. This, it seems, although unknown to the captain and crew, at the time they left her and went on the Columbia, was caused by the fact that while on the shoal they had started to pump some of the ballast out to lighten her, and when she came off into deep water she took a list to port. When she got afloat again, all the water ran down to the lee side. Her chief engineer says that they pumped out from 200 to 300 tons of ballast; that had a decided effect; gave her a list to port; after she came off, she took a sudden list to port, the water being out of the tanks— close on 40 degrees. When the prize crew from the Dorchester went on the Alcazar, they found about a foot, or foot and a half, bilge water in her—ordinary bilge water; she was not leaking. Beranger, the first officer on the Dorchester, was on the Alcazar when it was decided to anchor her. He says:

"I went forward and looked the windlass over, and, it being an Englishman, I did not understand it very well, and I knew the necessary levers to operate the windlass were locked up and I could not get at them. I tried the compressor, and the stern buckle also; and I tried to pry that out, and it would not come; and I tried the port anchor, and it would not go. I came up with both of them, and both of them went at the same time, and in paying out chain they both paid it out at the same time. I did not understand the windlass, and I gave her about 15 or 20 fathoms; did not give her much chain. We remained there about 20 minutes. During this time we wanted lights and did not have any. We were anchored, and we went down in the forecastle. We lit our way with matches until we found a lantern, and lit the lantern, and found two more lanterns and a can of oil. We came up and lighted one of these lanterns. It was at this time that the Seminole came up. We lowered a little boat, and he came up, and said Captain Chase had sent him there to tow us in. I said: 'We have just anchored. What can you do in getting the anchors up? We have got no steam.' And he said, 'We have got to slip those anchors;' and I said, 'It is a shame to let these anchors go;' and he said, 'There is no other method;' and I said, 'We can't lose these anchors and chains.'"

He says that he saw the spare anchor; they are supposed to be kept in good shape. This witness was examined at great length in regard to the manner the two anchors went off. He finally said, in reply to the question by the court:

"Tell me how it happened that two went when you only wanted one to go? That is what I didn't understand. You see it is a combination windlass and hoisting gear, and the necessary levers to operate that windlass were locked up in turrets on each side of this windlass, and we could not get in there. Then, as I said before, the starboard anchor would not go, and I put the compressor on this starboard anchor, also the turn buckle; then I tried the port anchor, and did it the same way, and that one would not go; so I came up with both of them at the same time and both of them went."

The relevancy of this and other testimony, regarding the manner in which the anchors were handled, is found in the contention, made by claimant, that the negligence, or ignorance, of Beranger, in operating the hoisting gear, deprived the Alcazar of the means of having proper anchorage in the Bight, resulting in her going aground and

sustaining injuries. After the vessel was anchored in Lookout Bight, by the Seminole, Chamberlain, with the other members of the prize crew, remained on her pursuant to the instructions of Capt. Chase. Chase had wired the Merchants' & Miners' Company, at 8 o'clock of the morning of December 26th, that he had brought the vessel, and to send a representative down to take charge.

Maj. Stickle, the officer in charge of the work by the government for making Cape Lookout Bight a safe place for anchoring vessels, was examined. Referring to conditions existing on December 27, 1912, he expressed the opinion that it was not safe to anchor a vessel drawing 18 feet of water in Lookout Bight in a southwest storm; that she would be safer at sea than in the Bight during a southwest gale. On cross-examination, upon a recital of the conditions claimed by libelants to have existed, he was asked:

"Then you think that when the Seminole took it into Cape Lookout Bight and anchored it, while it might later prove not to be an absolutely safe place, under all the circumstances it was the reasonably prudent thing to do?"

He answered:

"I do. The government proposes to make it perfectly safe by the proposed work, which is now under construction."

He further said:

"It would be the prudent thing to do under emergency, which I assume existed; and as to later disposition, it would depend on developments of the weather. It would undoubtedly be necessary to take care of the vessel after bringing her into this harbor."

Lieut. Covell says:

"There was no safer anchorage than the one selected in that vicinity. It is the safest place in that vicinity, and is considered a safe harbor in everything but a southwester, which blows into the Bight."

Lieut. Chalker, who was also on the Seminole at the time, says:

"We considered she was in a safe place. We deemed we had anchored her the best we could under the circumstances. She was in no distress when we left her. * * * At the time we left her, she was in no danger," etc.

There is other evidence to the same effect and to the contrary.

There was much testimony in regard to the condition of the anchor, with which the Alcazar was anchored in Cape Lookout Bight, by the Seminole. Chamberlain, who was on board, says that he saw the anchor when they pulled it over the side and "it looked all right to me" —did not examine it carefully. Chase says that he saw it, but did not examine it carefully. It seems that the anchor was rusted or "frozen." Its flukes did not turn, and therefore, as said by Capt. Carden and several other witnesses, it was of little or no use—nothing more than a piece of iron.

Claimant contends that it was negligent to drop this anchor without examining it. This becomes material, in view of the course taken by the vessel after being anchored. Chamberlain says that the vessel went aground when he was aboard of her. Hassler says that she was "aground" when he reached her on the morning of December 28th.

Adams, one of the prize crew, says that on the night of the 27th of December he had the watch from 12 to 6; that—

"she dragged on her anchor from the storm blowing in there; a storm was raging that night. She touched a shoal, and she was dragging, and the stern of the ship touched bottom, according to the bearing I had in that cove, and when the heel touches, her bow is bound to swing around parallel with it, and she swung around parallel with it, about 4 or 5 o'clock in the morning. The storm died down about half past 9 Friday morning, and about 10 o'clock, to our surprise, we found the ship coming up on a straight keel almost, and I stated to the second mate that we must have touched bottom. She stayed that way for two hours. * * * I never heard her pound until she started to come up straight about half past 9 Friday morning." On December 27th, "about 12 or 1 o'clock, she started to take that same list she had before again. We accounted for that by the fact that she must have gone ashore on low tide, and on high tide she floated again and took the same list she had when she was floating. She continued this as long as I was on her—until January 1st, Wednesday."

He says that after the crew of the Alcazar came on, Tuesday, December 31st, they pumped the water out of the ballast tanks on the low side and also pumped the bilge water out, and all that pumping made her come up straighter. She stayed in the same locality—did not change her position. Chamberlain gives about the same account of the movement of the vessel; that, during the time he was on her, the wind was westerly; the anchor did not drag. Hudgins, of the Life Saving Service, was on her while in the Bight; says she went aground; does not think she would have done so if she had been anchored with two anchors. There is very much contradictory evidence in regard to the location and condition of the vessel on January 1, 1913. Mr. Hassler, says that, after consulting Capt. Davies and Capt. Garrod, they decided to see if they could move her; get her out of the position she was in. The Life Saving crew gave assistance. He describes the efforts made to move her, none of which succeeded. He returned to Beaufort and wired for the Seminole, January 2d, and started back to the vessel. He was caught in severe storm and went to the Seminole, Capt. Carden being in command; reached the Alcazar on morning of the 3d of January. The weather moderated. The Seminole put a line out and pulled on Alcazar, but could not move her. He returned to Beaufort Sunday morning to get lighters. He returned to the vessel Monday morning, January 6th.

Capt. Carden, in his report to the Department, gave a very full and interesting account of his coming to the Alcazar and his work, resulting in pulling her off the ground and floating her. The portions of the report, read as a part of his testimony, material to the questions discussed by counsel, are:

"The Seminole left Wilmington at 7:10 a. m., January 2d, in response to a call for assistance from the Alcazar. * * * From Wilmington to Lookout Bight the Seminole made the best of her way; by that I mean she made the best speed possible, under conditions of wind and weather. The barometer was falling rapidly throughout the day, and there was every indication of the approach of a storm of considerable intensity. At 7:10 p. m. was able to bring the ship to anchor near the Alcazar in Lookout Bight, and immediately sent an officer on board that vessel to ascertain her condition and to request the presence of her master on board the Seminole."

He met Mr. Hassler and took him on board. The officer came and made his report, as did the officer sent by Capt. Carden. He says:

"The Alcazar had been driven bodily up the beach; she had a list of 15 degrees port; she had an anchor to seaward from the bow, and was riding to this anchor by a 10-inch hawser; the anchor had failed to hold, for the ship had been driven ashore. * * * The weather conditions during the evening of January 2d continued to get worse. The master of the Alcazar was sent back to his vessel and advised that the Seminole would commence work as soon as we could sound out and take a position."

By midnight of January 2d—

"it was blowing a whole gale and close attention had to be paid to taking care of the Seminole, the sea and weather conditions continuing throughout January 3d; the wind moderating at times, but gale practically holding true all day. There was no improvement by night; in fact, by 11 p. m. great care had to be exercised over the Seminole. Steam was kept on the main engine and the vessel made ready to go ahead at full speed from the signal. * * * A heavy sea was running into Lookout Bight, and the wind, instead of coming from the southeast, as predicted, was from southwest to west. I found it necessary to pass practically all night on the bridge; that is, up to 4 a. m., when the wind and sea moderated. During January 3d, salvage operations, on account of the storm, of any kind, were out of the question. It was estimated that the wind, at times, was blowing 50 miles per hour, and the barometer, at 8 p. m., read as low as 29.30; the wind, at the time of the reading, was southwest. It was not until 10 a. m., January 4th, that I was able to send a boat from the Seminole to sound out around the Alcazar. It was apparent to me that the Alcazar had been thrown still higher on the beach by the action of the storm."

The officer sent to take soundings made his report, and Capt. Carden decided how he would proceed to float the vessel. He produced the chart which was made, showing the soundings taken. He gave an interesting account of the manner in which the Seminole, from January 4th until January 8th, operated, saying:

"On the morning of January 8th the Seminole was in position early for pulling. Removing the deck load lightened the after portion of the ship. The Seminole commenced pulling well before high water, and about 30 minutes before high water was reached the stern of the Alcazar was seen to move. All available power was exerted on the Seminole. The ship was slowly pivoted into the tackle on the quarter, and once the stern was swung clear around. The Seminole had a straight pull of it to seaward. The Alcazar moved along with the Seminole into deep water. During the last state of the pull the line leading from the Seminole's spare anchor, which was being hauled on by the Alcazar's winch, parted. This anchor had been previously buoyed to guard against such a tendency, and we were thus able to raise it later and land it aboard the Seminole; shoved the Seminole out by the stern, from her, and got aground and got the 10-inch hawser to the fore chock, from whence we pulled until the ship was well out in deep water and able to take care of herself under her own steam. We then signaled the Alcazar to cast off the 10-inch line, which was done, and, in accordance with previous arrangements, the Alcazar steamed outside the Bight and circled until we were able to plant our spare bower, with the 10-inch hawser attached and buoyed and placed in deep water; that is to say, about 5½ fathoms, with mud bottom. As soon as the anchor was placed, we signaled the Alcazar to come in. This she did, picking up the hawser from the anchor as planted, and also letting go her own anchor. After anchoring her, the weather came on thick, with considerable wind. The Alcazar began to move. It was evident that the ship would again go ashore. The ground tackle was insufficient to hold her, consisting, as it did, of the Seminole's spare bower, anchor, and the useless bower anchor of the Alcazar. As there appeared to be uncertainty and hesitancy aboard the

Alcazar, I sent an officer aboard, with instructions to urge the master to slip everything and steam out. This was done, and the Alcazar stood out at 4:30 p. m. under her own steam, on January 8th."

The log of the Alcazar, from and including January 8th, shows that she encountered stormy gales, heavy seas; that her engine was disabled; ship leaked and listed; she gave distress signals. She was evidently in great danger from the Diamond Shoals.

"All hands engaged in throwing deck cargo over from starboard side on account of heavy list to that side. Ship making water rapidly, 5 feet bilges; engineers constantly pumping."

On January 10th, weather conditions improved, and, proceeding slowly, she reached Newport News the evening of that day.

Capt. Carden says:

"Every day the vessel was left in her position which we found her in meant the piling of sand around her and sinking deeper into her bed. If prompt action had not been taken, it would have been a very serious, difficult, and expensive job—probably entailing the jettisoning of every bit of cargo in her; and I even have my doubts whether it could have been accomplished at all."

During the operations of the Seminole, 190 tons of the logwood on her deck was thrown overboard. Capt. Carden says:

"The bottom is sand; nothing there to injure her bottom, no rocks. She was stranded broad on the beach. I think the storm drove her about 100 feet on the shoal. She was hard and fast aground when we arrived there."

Capt. Carden was examined several times. The foregoing is the substance of his narrative of events which came under his personal observation. In an examination, taken subsequently, he said that the bottom on which the Alcazar rested was "as soft as an asphalt pavement." He says that he used this expression simply by way of illustration; that he intended to say that it was a very hard beach.

She went on the dry dock at Newport News and received some temporary repairs. After two days she proceeded on her voyage, arriving at Chester, Pa., January 18, 1913. After discharging her cargo, or so much thereof on deck as had not been lost, she proceeded to Kensington shipyards, where, after being examined, she underwent extensive repairs. Prior to and on the trial a large number of witnesses were examined, their testimony covering more than 1,500 typewritten pages. Many exhibits, photographs, charts, etc., were filed. The case was fully argued, orally and upon briefs, with marked ability. Both the claimant and the Merchants' & Miners' Company agree, and that is about their sole point of agreement, in suggesting that the Columbia has no standing in a court of admiralty. In respect to the value of the Alcazar and her cargo, the differences are as widely divergent as in respect to the merit of libelants' services.

Libelants insist that, when salved and delivered to the owner, the value of the Alcazar was $100,000, and that of her cargo $60,000; that the damage sustained by her, subsequent to the delivery to her owner, was due entirely to its negligence in failing to care for her safety. The claimant insists, with equal earnestness, that her value, when libelants took her in charge, was not to exceed $65,000, from which should be

deducted the cost of repairs made necessary by libelants' negligence, $51,079.35; that the value of the cargo was but $23,444.72. They agree that her freight was $7,155.81. In addition to the charge of negligent conduct on the part of the crew of the Dorchester, claimant charges that the prize crew looted the vessel, carrying off every article of personal property of any value, and injuring, defacing, and wrecking her furnishings. With all deference to the contentions of the learned and zealous counsel, it may be that a fair measure of justice may be found somewhere between the divergent lines.

An examination of the depositions and oral testimony of the principal witnesses make the impression that, while they endeavored to describe conditions as they saw them, their inferences are more or less colored by their viewpoint. The conflict between the witnesses in regard to the alleged "looting" of the vessel is quite intense—probably some human feeling finds its way into this phase of the case.

[1] Taking up the claims of the libelants, and defenses of the claimant, in the order of time in which the transaction occurred, it will be convenient to first dispose of the claim made by the Columbia. The claimant moved the court to dismiss this libel "on the ground that it does not state a cause of action." This motion is renewed at the conclusion of the hearing upon the ground that "the libelants Salas and others have not shown any facts which would support a salvage award." This motion is opposed by the learned counsel for these libelants as "untenable." The question involved in this motion is whether the service rendered by the Columbia comes within the definition of salvage. Mr. Hughes defines salvage as:

"The reward allowed for a service rendered to marine property, at risk or in distress, by those under no legal obligation to render it, which results in benefit to the property if eventually saved." Adm. 127.

Judge Brawley, in The Apache (C. C.) 124 Fed. 905, says:

"Any service or assistance applied for or received by a vessel in peril or distress which in any measure conduces to its safety is in the nature of salvage service."

See The Besnard (D. C.) 144 Fed. 992; The Lowther Castle (D. C.) 195 Fed. 604; The Brina P. Pendleton (D. C.) 200 Fed. 848.

Claimant, conceding the correctness of these definitions, insists that, upon the facts disclosed by the testimony, the Columbia fails, in several respects, to bring the service rendered by her within its terms.

Was the Alcazar in peril or distress? Dr. Lushington, in The Charlotte, 3 W. Rob. 68, says:

"All services rendered at sea to a vessel in distress are salvage services. It is not necessary, I conceive, that the distress should be immediate and absolute; it will be sufficient if, at the time the service is rendered, the vessel has encountered any damage or misfortune which might possibly expose her to destruction if the service was not rendered."

In The Phantom, L. R. 1 A. E. 58, he says:

"It is sufficient if there is a state of difficulty and reasonable apprehension."

In the Ella Constance, 33 L. J. Adm. 191, he awarded salvage, saying:

"It is a case in which there was no immediate risk, no immediate danger, but there was a possible contingency that serious consequences must have ensued."

It would seem, upon the testimony, which, in respect to the condition of the Alcazar when her crew called for assistance from the Columbia, is not seriously controverted, that she was in a state of difficulty and reasonable apprehension. Her master and his men manifestly thought so; their conduct is not open to any other interpretation. Garrod, master of the Alcazar, says that for a man to remain on the vessel, while she was listing heavily, "he would be thinking of committing suicide"—that it "was a dangerous situation." His log shows:

"Ship bumping heavily until 5:50 p. m., when she came off with assistance of engines and immediately began to take heavy port list. Until about 6:30 p. m. the ship having a list of about 45 degrees, it was decided to abandon ship and go on board Columbia, to await events. In getting aboard tug with lifeboat and one small boat, the lifeboat, on account of heavy sea, was thrown under tug's counter and broken, so that she sank immediately; the small boat being hoisted on board. In the meantime, the Alcazar, drifting to southwest, with port rail awash; * * * wind shifting to west, southwest, and northwest, and increasing to heavy gale, with tremendous sea. The Alcazar became unmanageable."

Garrod further says that, if the sea had calmed down again, he would not have hesitated to go back on the ship. It was only during the rough weather that he was afraid to go and stay on her; that, in the light of subsequent events, knowing what she went through and did not turn turtle, he does not think was in danger of doing so. The evidence makes the impression that, at that time, the master of the Alcazar did not know the cause of her listing. He had on his deck 600 or 700 tons of logwood, piled some 10 or 12 feet high. Claimant insists that, however this may be, the services rendered were of no benefit to the ship.

"Success in the performance of the service for which a salvage reward is claimed, to the extent at least of the service contributing to the ultimate safety of the property in danger, is, as a rule, necessary."

Dr. Lushington, in The Zephyrus, 1 W. Rob. 329, says:

"I apprehend that, upon general principles, a mere attempt to save a vessel and cargo, however meritorious that attempt may have been, or whatever degree of risk or danger may have been incurred, if unsuccessful, cannot be considered in this court as furnishing any title to salvage reward. The reason is obvious, viz., that salvage reward is for benefit actually conferred, not for a service attempted to be rendered."

Counsel for the Columbia insists that the evidence shows that the service rendered by the Columbia contributed to the ultimate safety of the ship. This is earnestly controverted by claimant, to the extent of suggesting that all of the evils which overtook the Alcazar, by reason of the negligent manner in which she was handled by the Dorchester, would have been avoided if the Columbia had not placed her in the position in which the Dorchester found her; that "it would probably have been better for the claimant if the Alcazar had not been thrown in the path of the Dorchester"; that she would have been overtaken by the Seminole and brought safely into harbor. What may have been the fate of the ship if she had not called to her aid

the Columbia is necessarily speculative. The rule of the law is consonant with the only fair way in which men's conduct and the result flowing therefrom must be judged. The principle, consonant with reason and supported by judicial decisions, is that the character of the service performed is not to be fixed in the light of subsequent events, but in view of conditions existing at the time of performance. In The Apache (C. C.) 124 Fed. 905, Judge Brawley finds that, notwithstanding his conclusion that, at the time the service was rendered, the vessel salved was, for the reasons stated by him, in no actual danger of sinking, the libelant, acting in good faith upon reasonable apprehension to the contrary, was entitled to a salvage award. He says:

"It is none the less a salvage service that the peril apprehended did not befall, or that the labor expended was insignificant, and performed without actual risk. These considerations affect the quantum of compensation, but not the nature of the service, or the principles by which that compensation is to be measured." The Lowther Castle (D. C.) 195 Fed. 604.

The question which has given most concern is whether the service rendered by the Columbia contributed to the safety of the Alcazar; whether the element of success is found in the testimony. Whether she would, if not towed by the Columbia, have drifted back on the shoal, is necessarily a matter of conjecture. The testimony, in regard to the wind and currents, rather tends to show that she would not have done so. Claimant insists that, upon the testimony of the Columbia's witnesses, "the Alcazar was in no danger of drifting ashore at any time on December 24th, and that the only effect of the Columbia's towing was to retard, to some slight extent, her drifting seaward." Whether she would have been "picked up" by the Seminole or Dorchester, and what result would have followed, is, of course, speculative. That the Columbia responded to the call of the Alcazar when she was in apparent danger, and that she rendered such service as was in her power, is undoubtedly true. The captain of the Alcazar says that when the Columbia left her she was "in a place of safety, but I don't say that the Columbia towed her to a place of safety, * * * because the Columbia was only just holding her head to the wind; she was drifting, the Columbia with her."

There does not appear to be any very serious controversy that when the Columbia left the Alcazar, and its master cut the hawser, it was a prudent thing to do. The fact that she was caring for 26 men, in addition to her own crew, the captain and crew of the Alcazar, who did not consider it safe to return to her, is sufficient to relieve her of the charge of abandoning the Alcazar. It is evident that, at that time, the captain of the Columbia intended to return and render her such further service as was in his power, and that he did, after getting coal and supplies, return to the place at which he expected to find her. The Columbia responded to the call of the crew of the Alcazar, at a time and under conditions which they regarded as dangerous to her position. She did all in her power to aid and contribute to her safety. In the light of what occurred thereafter, it is impossible to say, with any reasonable degree of certainty, what would have been the ultimate result if she had not done so. It would seem that her claim, at least,

for compensation, comes within the principle announced in The Camelia, 11 P. D. 2:

"That services which should have contributed to the ultimate safety of a vessel, if interrupted before completion, without default of the salvor, are entitled to some remuneration, is applicable not only to a vessel saved from imminent risk of wreck, but also to a case like the present, where the vessel is brought into a case of greater comparative safety than that in which she was when she asked for assistance."

The suggestion, on the part of claimant, that she would have been overtaken by the Seminole and had a more effectual salvation than was secured to her by the course pursued by the Dorchester, involves the merits of the controversy between her and the Dorchester, which will be considered later on. There is nothing upon which to base the suggestion that the Seminole would have gone to the rescue of the Alcazar —certainly not at the time she did, but for the call of the Dorchester; hence, whatever suggestion may be made in respect to the Seminole is necessarily based upon the fact that she was called by, and responded to, the call of the Dorchester. The motion to dismiss the libel of the Columbia is denied. The question of the amount which should be awarded to her will be considered later.

[2] The discussion of the merits of the claim made by the Dorchester has taken a wide range. It cannot be, and is not, denied that the Dorchester undertook to salve the Alcazar at a time and under conditions which justified her captain and crew in regarding her as a derelict. She had been abandoned by her crew; that is, they left her under conditions which they regarded as unsafe. She was, when discovered by the Dorchester, at 9:25 at night, listing at 40 to 45 degrees, without light or steam, in a place and under conditions which were dangerous. Capt. Chase and his crew, whatever may have been their expectation in respect to salvage, undoubtedly, in good faith and, so far as the evidence shows, on the night of December 24th, did all in their power to secure the vessel and tow it into a place of safety. The description of the efforts of the mate and his voluntary crew, as given by Capt. Chase and Beranger, leave no doubt upon my mind in that respect. It is not very material, as it affects the services rendered at that time, whether the crew of the Alcazar intended to return to her. The fact is that they were not on board, and left no evidence that they intended to return. There is much contradictory testimony regarding what they took away with them. However that may have been, the condition in which the crew of the Dorchester went upon the Alcazar did not enable them to stop and look for the personal belongings of her crew.

[3] "A vessel found at sea in a position of danger and without any one of her crew on board of her is prima facie a derelict." Law of Salvage (Kennedy) 55; The Laura, 14 Wall. 336, 20 L. Ed. 813. In The Shawmut, 155 Fed. 476 (D. C. S. C.), Judge Brawley says:

"Prima facie a vessel found at sea in a situation of peril, with no one aboard of her, is a derelict; but where the master and crew leave such vessel temporarily, without any intention of final abandonment, for the purpose of obtaining assistance, and with the intent to return and resume possession, she is not technically a derelict. * * * She was what may be called a quasi derelict."

The condition under which her crew left the Alcazar, and in which she was found by the Dorchester, distinguishes her status from The Kelton (D. C.) 181 Fed. 237. It is not very material, at this point, to fix her status in that respect. Her condition was well calculated to create the impression on the mind of Capt. Chase and his crew that she had been abandoned by her crew. There is evidence sufficient to support the conclusion that it was difficult and somewhat dangerous for the men who went upon her. Of course, it is a question of degree; and as is usual in such cases, the degree of danger is more or less magnified and minimized, according to the viewpoint. There is no doubt that the first volunteer crew who went were unwilling to take the risk and returned to the Dorchester. The difficulty experienced by the Dorchester in getting control of the vessel, the parting of the hawsers, her eccentric behavior, and the assistance rendered by the Merrimac, are all testified to by credible witnesses, who are not contradicted. Nothing is found in the conduct of the officers and crew of the Dorchester subjecting them to criticism until after the Alcazar, on December 25th, was towed into a place where it was thought advisable to anchor her. Capt. Chase was not willing, and it would seem correctly so, to take the Dorchester, with the Alcazar in tow, into the Bight; it was not safe to do so. He sent a wireless to the Seminole at Wilmington to come to his assistance. He, of course, did not know when she would arrive. It would seem, therefore, that, acting under the advice of Yeomans, of the Life Saving Service, his decision to anchor her was wise and proper. Yeomans reached the Dorchester about 4:30 p. m., December 25th, and piloted her, with the Alcazar in tow, until 9 o'clock p. m., to a point at which he says:

"I told him to let the anchor go. * * * I thought it was too dangerous to go any closer, with that ship, with a vessel as large as the Dorchester, with a tow of that kind. * * * Thought this was a reasonably safe place, under the circumstances."

Counsel for the claimant criticizes this action. Under existing conditions, it would seem that the course pursued is not justly subject to criticism. The trouble which arose after she was anchored by the Seminole in the Bight, it is insisted, resulted from the negligence of Beranger in dropping both of her anchors. It is manifest that Beranger did not intend to drop both anchors; that he did not understand how to operate the gearing and, in his effort to drop one, both went. It appears that this was the result of ignorance, rather than negligence. While his manner of getting the vessel anchored undoubtedly resulted in dropping both anchors, instead of one, as he intended, it cannot be termed gross negligence or misconduct. It is clear that, when Lieut. Covell came with the Seminole, it was impossible, in the condition of the Alcazar, to raise the anchors. It was necessary to slip them in order to take the vessel into the Bight. This condition necessitated the dropping, when she was in the Bight, of the kedge or spare anchor, and here claimant criticizes the conduct of the crew of the Dorchester. The evidence shows that this anchor was so constructed that, if in proper condition when dropped, its flukes automatically open. A model of the anchor was shown on the trial. By reason of rust, the flukes did not

open; it was said by the witnesses that it was "frozen"; the result being that it was of but little value as ground tackle.

Several phases of the controversy were urged in regard to this anchor and its condition. Claimant insists that it was negligent on the part of the crew of the Dorchester, who were in charge of the Alcazar, to drop the anchor without examining it and correcting its condition. By way of answer, they insist that they were entitled to assume that the anchor was kept in working order; that it was the duty of the crew of the Alcazar to keep it in proper condition, and, if they failed to do so, any damage sustained by its use should be attributed to their negligence. There is no doubt that the anchor was rusted, or "frozen." A number of interesting suggestions are made in regard to placing liability for the condition and use of this anchor. The weight of the evidence tends to show that, while the Alcazar was in charge of the crew of the Dorchester, both of her anchors were dropped by reason of the failure of the mate to understand the proper way to operate the gearing; that the kedge anchor, which was dropped, was not in proper condition; that if the Alcazar had not lost both her anchors, before being towed in the Bight, her ground tackle would have enabled her to keep off the shoal. There is evidence that these anchors, by reason of being exposed to the salt water, are apt to become rusty in a short time. There is no evidence that their attention was called to its condition, or that, without examination, such condition would be observed. Lieut. Covell, who was in command of the Seminole and superintended anchoring the Alcazar in the Bight, did not observe any trouble with the anchor. He says that they anchored with "the best appliances available." He thought she "was safe to anchor." The weather at that time was good.

"It would have been much better to have had one of her bow anchors. She would probably have held on there, although I can't be sure of that."

She went on the shoal on December 27th, and was never again, until pulled off on January 8, 1913, off the shoal. To what extent her conduct and condition would have been different if she had been anchored with one of her bow anchors, it is impossible to say; and to what extent the kedge anchor would, if in proper condition, have protected her, is equally conjectural. That the loss of the first, and the condition of the other, were misfortunes, cannot be doubted; and that the loss of the bow anchor is attributable to the ignorance of Beranger is equally clear. These conditions cannot be lost sight of in fixing the degree of merit to be given the libelant in awarding salvage.

If the vessel had been delivered to its owner on December 28th, or the 31st, many of the difficult questions which have given counsel and the court much trouble would have been avoided. That which occurred between December 28th, when Mr. Hassler first appeared and sought permission to go on the vessel, and January 1, 1913, when he was given possession, gives rise to questions in regard to which there is much divergence of opinion and some feeling. As we have seen, Capt. Chase, on the morning of December 26th, wired the home office of the Merchants' & Miners' Transportation Company. This telegram is not in

evidence; but it is in evidence that counsel promptly wired appropriate parties for information as to the owners of the Alcazar, and on December 27th received the desired information. Mr. Hassler, the treasurer of the claimant company, knowing that the Alcazar was on her trip, was on the lookout to ascertain, from the shipping news in the Herald, her whereabouts, expecting to see notice of her arrival at Chester, her destination. He says, and for manifest reasons stated by him, that he was very much interested in her safe arrival. A large portion of his estate was invested in the vessel and his personal interest in her safety very deep. On December 25th, he saw from the Herald that the vessel was in distress somewhere on the North Carolina coast. He immediately resorted to the most reliable source to locate her and learned that the revenue cutter Seminole was in communication with her. He promptly came to Beaufort, the nearest point from which he could reach the vessel, reaching there December 27th, where he met the crew, who, by his direction, came to Beaufort. He went as quickly as possible on December 28th, with his marine superintendent, to the Alcazar, and asked permission to go on her. His company had employed counsel in New York, and communication had been opened with counsel for the Merchants' & Miners' Transportation Company, by phone and wire, for the purpose of entering into stipulation for bonds, etc.

All parties were diligent in endeavoring to have the vessel delivered to its owner. While Mr. Chamberlain was obeying the orders of Capt. Chase, in refusing to permit any one to go on board, it would seem that the appearance and manner of Mr. Hassler and his frank statements should have secured to him at least some consideration. Failing to secure admission on his vessel, which he saw "aground," he returned to Beaufort and promptly resorted to every possible method of getting into a position to do so. Arrangements having been made between counsel, the libel was filed and bond given. Mr. Iseberg, a representative of the libelant, was sent to the Alcazar, and on December 31st Mr. Hassler was, with his crew, permitted to go on board, and at once began preparations to get her off. On January 1, 1913, receipt was signed and possession given to Mr. Hassler. Some criticism is made of the failure of Mr. Hassler to act more promptly than he did in securing the aid of the Seminole. She was aground. The crew, beginning on December 31st, to fire her engine, endeavored to move her without success. Mr. Hassler returned to Beaufort, and on the morning of January 2, 1913, wired the Seminole at Wilmington. She started at 7:10 a. m. for Lookout Bight, and reached there at 7:10 p. m. on that day—arrived in very severe weather. I am unable to perceive any unreasonable delay or negligence on the part of Mr. Hassler. He was examined orally before me. He gave a frank, intelligent, and interesting account of his experience and the course pursued by him under most trying and difficult circumstances, with his vessel aground and in danger of becoming a total wreck; a crew on board unable themselves, and unwilling for him, to take any action for her safety, a stranger, on a dangerous coast, it is impossible to doubt, after hearing him testify and seeing his manner, that he was strongly moved and anxious to leave nothing undone, at the grave peril of his life, to

save his vessel. There were no tugs or salving machinery at Beaufort, and none, other than the Seminole, at Wilmington, or nearer than Norfolk.

Harsh words of criticism on the part of either of those who were endeavoring to clear up an unfortunate situation do not afford much aid to a solution of the questions to be decided. Capt. Carden, with the Seminole, responded promptly to the call and came to the Alcazar. He acted with commendable promptness and intelligence, but before it was possible to begin operations a severe storm came up, rendering it necessary to use every precaution for the safety of the Seminole. The description of the storm on the night of January 2d, continuing through January 3d, as given by Capt. Carden, was quite graphic. The wind was "blowing a gale" from the southwest, driving into Lookout Bight; the unfortunate Alcazar being driven further on the shoal. It was not until January 4th that it was possible to begin the work of pulling her off. This was intelligently and diligently continued until, at 4:30 p. m. on January 8th, she "stood out under her own steam." The season and the weather contributed to complicating the situation. While each of the parties feel that they pursued a course entirely within their legal rights and with due regard to the rights of the other, it is manifest that, if in close touch, some of their differences would have been avoided. While the Dorchester sustained no injury in her effort to tow the Alcazar into a safe place, as said by her captain, the conditions under which the work was undertaken were dangerous, and—

"if you have a vessel worth $300,000 and 60 or 70 people, all under you, if you succeed in a thing like this, you get greatly praised; but you know what you get if you fail."

He has had 33 years' experience "in following the sea" from "cook to master," and 13 years as master mariner. His manner in testifying was frank and his testimony intelligent; his description of the situation and his manner of dealing with it clear and free from any attempt at exaggeration. The Alcazar was listing heavily. She had a deck load, approximately 10 to 12 feet high, of logwood. "She would roll the top of the load down to the water, and also the bridge, and then she would come up, so the deck load would be up, and then it would go down again." Capt. Carden says that, if in the condition described by Capt. Chase, he would regard the Alcazar "in a very dangerous position" and "a menace to navigation"; that with the currents at that place "she would have a tendency to drift on the shoals." Capt. Chase says:

"It is the currents which drift her. The current had the best of the wind, at the time the Dorchester found the Alcazar." The Alcazar was, when found by the Dorchester, "directly in the path of every vessel that goes up and down the Southern coast, except those going to Cuba, and it had been very dark, and we would have run into her before seeing her ourselves." The crew of the Dorchester found on the Alcazar a "rope, indicating that some one had been trying to tow her." This was the hawser cut by the Columbia. The weather "was getting better."

When asked why he did not wait until morning before putting a line on her, he said:

"The vessel was in a bad place, and it was my duty as a master to take her out of the place as soon as possible. You can never tell anything about the weather down here, especially in the winter time."

He says that there was danger of coming into collision with the Alcazar while towing her, by reason of a mistake in the signals; that this danger is always incident to navigating in close quarters. The condition described by Capt. Chase and the danger incident to towing the Alcazar are very similar to those described by Judge Hughes in The Great Northern (D. C.) 72 Fed. 678. The uncertainty of the wind and weather, at that season and place, is illustrated by Capt. Carden, who says that while in the Bight, on January 2d, he received a radiogram from Washington, announcing the approach of a southeast storm; that by midnight it was blowing a whole gale; "a heavy sea was running into Lookout Bight, and the wind, instead of coming from the southeast, as predicted, was from southwest to west southwest, by south, and again southwest."

It would seem that the course pursued by Capt. Chase is not subject to criticism. That he showed skill and determination to accomplish his purpose is manifest. The coming of the Merrimac was fortunate, and the aid rendered by her was valuable, if not essential to success. The first mistake made by the crew of the Dorchester was in dropping both of the anchors. Capt. Chase wisely called the Seminole to his aid. Prudence dictated that he should not take the Dorchester, with the Alcazar in tow, into the Bight. The conflict in the evidence in regard to the safety of Lookout Bight is more apparent than real. Maj. Stickle, a very intelligent officer, who has been in charge of the work being done by the government, at a cost of more than $3,000,000, to make Lookout Bight a safe harbor for vessels, says that, except from a southwest wind it was, on December 27, 1912, a safe place in which to anchor a vessel. It is to protect vessels from this danger that the government work, a sea wall, is being constructed. The testimony of the other witnesses accords with that of Maj. Stickle. Lieut. Covell, who was in command of the Seminole, and towed and anchored her into the Bight, manifestly regarded it as the "safest place available." As insisted by claimant, he was pro hac vice the agent of the libelant, and it is responsible for his conduct, in respect to the anchoring of the Alcazar. It is manifest that he thought the course pursued the best that could be done under existing conditions. It is difficult to see what else could have been done. The Dorchester was a passenger boat, running on a schedule. It was not practicable for her to stand by the Alcazar. She had been delayed 45 hours, and owed the duty to her passengers to proceed on her trip. In the absence of a crew on the Alcazar, or any evidence of her ownership, or information enabling him to ascertain the name of, or communicate with, her owners, Capt. Chase pursued the only course open to him.

[4] In the case of a derelict, the salvor is entitled to retain possession; but in such case it is not the duty of the salvor, under all circumstances, to retain exclusive possession. Law of Civil Salvage, Kennedy, 8. The right to retain possession is not absolute, but dependent upon conditions affecting the mutual rights of the salvor and owner. Dr.

Lushington, in The Lady Worsley, 2 Spinks E. & A. 255, criticized the doctrine laid down by some authorities holding that, under "whatever circumstances, it was the duty of the salvors to retain possession of the property." As the surrender of possession does not constitute an abandonment or waiver of the lien, it would seem that, unless there was a probability that, before process could issue and be served, the owner would remove the property beyond the jurisdiction of the court, or to a place rendering the enforcement of the salvors' lien more difficult or expensive, possession should be surrendered to the owner, or his representative, upon his appearance and demand, at least to the extent of permitting him to come on the vessel and aid in taking care of her. There seems to be no hard and fast rule prescribing the relative right and duty of the owner and the salvor in regard to the time of, or condition upon which, exclusive possession may be held by the salvor. The purpose of the court of admiralty is to protect the rights of both parties. The primary purpose of salving maritime property is presumed to be for the benefit of the owner. The reward given to the salvor is by way of compensation for benefit received, combined with a just regard for the general interest of ships and marine commerce, or as a reward for perilous service voluntarily rendered, and as an inducement to mariners to embark in such dangerous enterprizes to save life and property. The right to demand possession by the owner, and to retain it by the salvor, will therefore be measured by the necessity for preserving the rights of both parties.

"As a general rule, unless a vessel has been utterly abandoned, and is, in contemplation of law, a derelict, the occupying salvor has no right to the exclusive possession, and is bound to surrender to the master on his appearing and claiming charge; and the master can, in such case, employ whom he pleases, and take what measure he thinks proper, for the preservation of the ship. The court will, however, be guided by the circumstances of each case in determining whether or not the master of the salvors' vessel is justified in refusing to allow the crew of the salved vessel to return to their ownership before the completion of the salvage. And if the vessel is, at the time of the demand by the master, in such critical position that there may be risk of loss or damage to her unless the salvors are allowed to complete their operations, it seems that they may retain possession pending such completion." 24 Am. & Eng. Enc. 1225.

The conditions existing on the morning of December 28th were embarrassing to all persons concerned. The actors, on the vessel and at the Bight, were not advised as to their respective rights and duties. Chamberlain and his three associates were in charge, under instructions given them by their superior officer, of a vessel which had been found in a condition which justified them in regarding it as abandoned by her crew, for reasons which appeared to be sufficient for such abandonment. They found a hawser attached in such manner, and in such condition, as indicated an unsuccessful attempt to tow her. Such was the fact. They knew nothing, and had no means of learning, the whereabouts of the crew or of their purpose to return. The Seminole brought no information respecting their having gone to Wilmington. Capt. Chase had been to Beaufort and learned nothing of them. The Alcazar was found on a coast having a well-known record for danger and disaster to mariners and marine property. Members of the Life Saving

Service knew nothing of the fate or whereabouts of the crew of the Alcazar. Chamberlain knew that Capt. Chase had, on December 26th, notified the owner of the Dorchester that he had left them on the Alcazar—the vessel on the shoal, with insufficient anchorage, or ground tackle, and in danger of going further on, as she did. Mr. Hassler, acting under a natural impulse and in conformity with his legal rights, hastened to the nearest place from which he could reach his stranded vessel. In all that he did he acted in absolute good faith, and without any purpose of depriving the salvors, then unknown to him, of their rights or reward. The only information which he had, when leaving home in search of his ship, was that the revenue cutter Seminole was in communication with her. He had learned of the whereabouts of the crew through Mr. Sprunt, the British vice consul at Wilmington.

The account given by Mr. Chamberlain, and the other persons present, on December 28th, as to what passed between them in regard to Mr. Hassler's request and his refusal to permit him to go on the vessel, does not, in any material respect, differ from that given by Mr. Hassler. While Mr. Chamberlain was under no obligation to accept his statement, it would seem that the fact that he had gone out to the vessel, his appearance, his manner, all clearly carrying the strongest possible evidence of credibility and sincerity, would have produced on the mind of a man of fair intelligence belief in the truth of his statement. Mr. Hassler made no suggestion of a purpose to take exclusive possession of the vessel, or interfere with the possession of Chamberlain. He had not, at that time, received the telegram from his counsel, advising him to take possession by force, if necessary. That telegram directed him not to interfere with the crew left on her by Capt. Chase, but simply to do what was necessary to the safety of the ship. It is difficult to understand how Mr. Chamberlain could have supposed that Mr. Hassler intended, or had the power, to interfere with his rights in regard to possession. It is clear that he and his associates were unable to get her off the shoal, or prevent her from going further on. It is not probable that Mr. Hassler, and those who were with him, could have done so. They could have ascertained more clearly her position, tried her engine, as they did on December 31st, and been enabled to seek the aid of the Seminole earlier.

Without undertaking to inquire what injury, if any, claimant sustained by the refusal of Chamberlain to permit Mr. Hassler to go on the vessel, I am of the opinion that he was not justified, under the circumstances, in doing so. Mr. Hassler was entitled, as a matter of right, to go on board and take such action, not inconsistent with the right of the salvor, to get her off the shoal and protect her from further injury. After his unsuccessful effort to get control of, or to secure an opportunity to rescue, the vessel, he returned to Beaufort. He telegraphed his associates and attorneys, doing all in his power to get in position to secure admission to the vessel. The 29th of December being Sunday, he remained in Beaufort, where he met Mr. Boyt, who, together with Mr. Cornbrooks, had been sent by the libelant to Beaufort to inspect the Alcazar. Mr. Boyt, with whom he was acquainted, told him that the vessel was "in a bad position and something ought to be done as

soon as possible." This conceded fact "cuts both ways." Libelant finds in it the imposed duty on Mr. Hassler to "get busy"; whereas it shows that Mr. Boyt, the representative of libelant, had on the 28th made an examination of the vessel, knew her position, and appreciated the necessity for prompt action. He remained in Beaufort on Monday, December 30th, waiting for advice. It was useless for him to return to the vessel until he had some assurance that he would be permitted to go on her. Libelant sent as its representative Mr. Iseberg, and arrangements having been made between counsel for filing the bond in New York, he returned with the original crew, with the exception of one man, to the Alcazar, on Tuesday, December 31st, and was permitted to take them on board. He describes the condition which he found, saying:

"I walked over the deck load aft to the cabin, and I don't think there is anything in the world that could convey to you my feelings when I saw the state of things. I felt like a child who has broken the best thing he had ever wanted. This steamer was the realization of my life, and when I saw the cabin with everything smashed to pieces, the table upside down, * * * and it was a horrible thing to see."

In consequence of a disagreement in regard to the form of the receipt, possession was not given until January 1, 1913, but with the consent of Mr. Chamberlain steam was gotten up on the main boilers and the next day they decided to try to move her. Their effort was unsuccessful, and on January 2d Mr. Hassler wired for the Seminole to come to his assistance, with the result set forth in Capt. Carden's testimony. That the vessel was driven further on the shoal between December 31st and January 2d, when the "great storm" came on, is quite probable; to what extent is conjectural. Under the circumstances, no criticism can be made of the course pursued by Mr. Hassler, nor any injury sustained by the vessel during that time attributed to him. He was not called upon to wire the Seminole to come to his aid under the conditions existing on those days. On January 1st, with the assistance of the Life Saving crew, Capt. Davies and Garrod endeavored, by using all of the means within their power, to move the vessel. Assuming that the Alcazar was in good condition on December 23d, when she first went on the shoal, and that upon coming off she immediately took a list of 45 degrees, and assuming that, during the time intervening between that day and December 31st, we have a fairly accurate account of the experience through which she went, the conditions described by Mr. Hassler on December 31st, when he went upon her, are not difficult to understand. That she sustained injury during these days is manifest; but when we undertake to fix, with any degree of certainty, at what particular time and under what particular condition the injuries were sustained, we are in the realm of conjecture. She was on the first shoal, December 23d, only a few hours, from about 2 o'clock to 6:30 p. m., and came off without assistance. Between that time and the time she went on the shoal in Lookout Bight, she was in water of sufficient depth. What damage she sustained during this period, if any, was the result of rolling and listing. She evidently pounded somewhat during December 27th and the 31st. It was manifestly impossible for the Seminole to render any assistance prior to January 4th. It is suggested

by libelant that Mr. Hassler should, on December 28th, or prior to January 1st, have wired to Norfolk for aid. It would seem that, as the result showed, he pursued the wisest course open to him.

In regard to the conduct of Beranger, which resulted in the loss of both anchors, and the use of the kedge anchor, after the Alcazar was towed into the Bight, and its effect upon the safety of the vessel, there is a wide divergence of view on the part of counsel. The measure of duty imposed upon salvors in caring for the property under such circumstances is that they act in good faith and with reasonable judgment and skill. The Laura, 14 Wall. 336, 20 L. Ed. 813; The Infanta Maria Teresa, 188 U. S. 283, 23 Sup. Ct. 412, 47 L. Ed. 477; The S. C. Schenk,. 158 Fed. 54, 85 C. C. A. 384; The Henry Steers (D. C.) 110 Fed. 583; Dorrington v. City of Detroit, 223 Fed. 232, —— C. C. A. ——. While in the application of this principle, and upon the evidence in this case, the libelant should not be held to forfeit all claim to salvage, it becomes material to be considered in fixing the degree of merit to be attached to the service as affecting the amount of the award. If the loss of the anchors and the use of the kedge anchor contributed to the condition in which the vessel was found by the claimant and the injury sustained by her, it becomes of interest to inquire as to the degree of blame, if any, which should be attributed to Beranger and his crew, in dropping the two anchors and using the kedge anchor in its "frozen" or rusted condition.

After a careful consideration of the evidence, aided by exhaustive oral argument and briefs, I conclude:

(1) That the Alcazar was, when overtaken by the Dorchester, on the night of December 24th, a quasi derelict, and the crew of the Dorchester were justified in taking such a course with her as if in truth she was a derelict—assuming, of course, the resultant liability to take such care of her as, under similar circumstances, they would have taken of their own property.

(2) The salvage service rendered, in securing control of and towing her, involved danger to their lives and the property in their care, and was therefore meritorious.

(3) That such service contributed to her safety, and although, by reason of conditions pointed out, its final outcome was not so beneficial to the owners as they anticipated, they are entitled to a salvage award, the amount to be measured by the elements uniformly recognized by courts of admiralty.

[5] The two elements, in respect to which there is an irreconcilable contradiction in the testimony and the views of the parties, are the value of the vessel and her cargo and the benefit conferred on its owners. Here there is no point of agreement. It is impracticable and would serve no useful purpose to set out the evidence at any considerable length. The Alcazar was built in 1893, and registered in Lloyd's Register—Class "100—A 1"; passed her last examination in 1912. She was purchased by claimant January 17, 1912, for $64,900 cash. On December 28th Mr. Cornbrooks and Mr. Boyt, both of whom had considerable experience and knowledge in the construction and sale of ships, representing the Merchants' & Miners' Transportation Com-

pany, went to Lookout Bight and examined the Alcazar. They place her value at $100,000. Mr. Cornbrooks saw her again at Newport News, at Chester, Pa., and in the dock at Kensington Shipyards, Pa., while undergoing repairs, made an inspection at Newport News and the shipyard, and says:

"She was in very good condition. They had the bottom plates off and could get at the interior, the tanks, etc."

He gave the prices at which several other vessels, of approximately the same size, etc., of the Alcazar, were sold during the year 1913. He used these sales as a basis of comparison to sustain his opinion. He says that, in the latter part of 1912, and during the first part of 1913, "tonnage was in demand and prices were higher." He says that all of the vessels, whose sales he referred to, were "American boats"—that they brought higher prices than vessels of similar character under the English flag. The Alcazar sailed under the English flag. Mr. Boyt, who also saw and examined the vessel, concurred with Mr. Cornbrooks in regard to her value. Both these witnesses were cross-examined, at considerable length, in regard to the basis upon which they place her value. They are intelligent and appeared to be honest in the expression of their opinions. Libelants also rely upon the estimated value placed upon the vessel and cargo by Willcox, Peck & Hughes, the insurance agents of claimant. Claimant wired counsel for libelant, December 26th, that their agents would attend to giving bond —that counsel wired the agents for information as to value for the purpose of enabling him to fix amount of bond. On December 27th, they wired counsel for libelant:

"Alcazar valued at seventy five thousand dollars, cargo about fifty thousand dollars—please wire amount bond required."

This is relevant, but not conclusive, evidence upon the question of value. Claimant avers that Mr. Hassler said to Mr. Willis, while on the vessel, that her value was approximately $100,000 and the cargo $60,000, and that, upon that information, Willis made his wreck report; and he so testifies. Mr. Hassler denies having made any statement to Mr. Willis in regard to her value. He says that he knew nothing whatever of the value of the cargo, and that, acting under the advice of counsel, he refrained from "talking." He is very positive in his denial. I am of the opinion that Mr. Willis is mistaken in saying that he received the information regarding the value from Mr. Hassler. It is quite certain that he did hear the estimate, as he reported it. Mr. Cornbrooks and Mr. Boyt had, prior to the time Mr. Willis fixes the alleged conversation, expressed their opinion in regard to her value and telegraphed to the Merchants' & Miners' Transportation Company. It was doubtless a subject of conversation between the "prize crew" and other persons interested in her value. It is quite improbable that Mr. Hassler should have made the statement, and equally probable that Mr. Willis heard it from others about the place.

Counsel for libelant further insist that claimant, by the solemn admission in its answer that the value of the Alcazar, "prior to her

stranding on December 23, 1912, was not exceeding $60,000, and that the fair value of the vessel herself was $65,000, and that the value of the cargo was not in excess of $44,000, and that the value of the vessel, when she finally reached Newport News, was not in excess of $25,000," is bound by this solemn admission. While, as insisted by the learned counsel for libelant, a fact solemnly admitted in the pleadings will, as against the party making the admission, be taken as true, the rule does not extend to estimates of value, or averments which must, of necessity, be based upon opinion, or inference. They are competent to be considered by the courts as evidence—as declarations as to a matter of opinion, made by the party against his interest—but not conclusive. The question of value was not jurisdictional, or essential to the right of action, or the validity of a defense. It is known from experience that, in drawing pleadings, counsel frequently make averments, more or less formal, without careful consideration. The substantial rights of parties should not be dependent upon, nor courts prevented from ascertaining the truth by, such averments.

Claimant introduced several expert witnesses having experience and special knowledge in regard to the construction and value of vessels. Mr. Garney had known the Alcazar since 1907, and had advised against her purchase by Mr. Hassler. He represented claimant in connection with the repairs made at Newport News and other places; saw her before the repairs were made and after she was "opened up"; checked over the plates which were sprung; examined and approved the bills. They amounted to $51,040.95, of which $1,-881.30 "were not due to recent damage." He says that the repairs were necessary to unable her to keep in her class with Lloyd's. He gives it as his opinion that, after she was repaired, her value was between $55,000 or $60,000. He gives the prices at which other vessels in her class sold, as a basis of comparison to sustain his opinion. He says that "not a dollar was spent on her that was not necessary to get her back into her '100—A #1' class." Frank S. Martin, who had large and long experience as consulting engineer, naval architect, ship and engine surveyor, and appraiser, also valuing ships of all kinds for insurance purposes, purchase, limitation of liability, etc., gives it as his opinion that the value of, the Alcazar, in sound condition, January, 1913, was $63,900. He states his reasons for fixing this amount. Robert Haig, with long experience, gives a history of the Alcazar, and reaches the conclusion that in sound condition her value, January, 1913, is $61,900. He examined her in February and March, 1913, two or three times a week. H. L. Jobson, surveyor to the London Salvage Association, with 30 years' experience, examined the vessel, and says that her value, in sound condition, was $58,500. In this divergence of testimony of experts and opinion witnesses, we inquire what was done with the vessel after being repaired. Mr. Hassler says that he tried to sell her soon after she was repaired; offered her at $85,000; tried the Japan market, there being no market in this country for British steamers; failed to get a satisfactory bid; made sale to a German, subject to inspection. He was to pay £14,000, but, upon inspection, rejected her. He finally sold her for

£12,250, or $61,250; "but, in order to get that price, we had to put her through the survey, costing between £2,000 and £2,500, $10,000 or $12,500, in repairs to get her in her class" in Lloyd's Register. This was in 1914.

While it is true that sales made one year prior, and one year subsequent, to the date at which the value of the vessel is to be ascertained, are not of controlling probative force, yet, as said by the court in The Albert Dumois, 177 U. S. 255, 20 Sup. Ct. 595, 44 L. Ed. 751, it is better evidence than the conflicting opinions of, experts, an illustration of which is seen in The Haxby, 83 Fed. 715, 28 C. C. A. 33. There is no suggestion that Mr. Hassler bought her for less than her value. Mr. Garney says that he advised against the purchase. She was then 18 years old. All of the witnesses concur in saying that the percentage of deterioration at that age is quite large. It does not appear that any repairs were put upon her after the purchase by Mr. Hassler. There is abundant uncontradicted evidence that Mr. Hassler used every possible effort to secure her full value. It was to his interest to do so. He had spent $51,000 on repairs, and, to make the sale at $61,250, he was obliged to spend as much as $10,000 more. According to the decided weight of the opinion evidence, she was not worth to exceed $63,000, when she was overtaken by the Dorchester, on December 24, 1912. It is not denied, and is abundantly proven, that the amount expended for repairs was necessary, and of this $1,881.30 were not due to recent damage, which leaves the net amount for repairs caused by the injuries sustained between December 24, 1912, and January 10, 1913, when she reached Newport News, $49,159.65, thus leaving her actual value, on that day, $13,840.35.

The question around which counsel have had strenuous struggle is the location of liability for this result. The situation comes to this: The Alcazar was worth, when the salvage service was begun, about $63,000. When she was placed on the dry dock at Newport News, she was worth $13,840.35. She was surrendered to her owner, for practical purposes, December 31, 1912, aground, in Lookout Bight. She went on the shoal, while in possession of the salvor, December 27th. Between December 23d and December 27th she had been listing heavily—abandoned, in fact, by her crew, because in a dangerous condition. She had, as her cargo, 2,800 tons of logwood, 700 tons piled on her deck, 10 to 12 feet high. Claimant charges that her injuries should be attributed to three causes, each of which, it alleges, resulted from the acts of the salvors: (1) That she lost both her bow anchors; (2) that she was anchored in an unsafe place; (3) that, by the negligence of the salvor, the anchor used in Lookout Bight was rusted or "frozen" and unfit for use. I am of the opinion that Lookout Bight was the safest available place in which she could be anchored, and that no blame attaches to the Dorchester in that respect; that the loss of the bow anchors and the use of the kedge anchor, while not sufficient to sustain an action for negligence, should be taken into consideration in fixing the degree of merit attaching to the salvage service. I am of the opinion that both causes contributed to the condition in which the Alcazar was found on December

28, 1912; to what extent and how far is necessarily conjectural. I am inclined to think, from the evidence, that, as said by several of the witnesses, the vessel was, before her misfortune, "in a run-down condition," and was not worth so much as $63,000. It is not very material on the question of her value whether the necessity for spending the large amount for repairs resulted from her condition before going aground, or because of injuries sustained while aground. The result is the same. Her value was not so large as thought by libelant's experts.

If it be said that when, on January 1, 1913, she was delivered to the claimant "as she lies," such injury as she had, to that time, sustained is to be charged the salvors, and that injury sustained subsequent thereto is to be charged to claimant, other questions at once arise: Whether, and to what extent, the condition produced by her anchorage continued to contribute to the injury sustained until she reached Newport News; whether, if possession had been surrendered on December 28th, the injury sustained by the "great storm" of January 2d would have been averted, etc. It is manifestly impossible to separate the injury with any degree of accuracy, either in respect to time or cause. An appeal to the common-law doctrine of proximate cause for the purpose of fixing liability for any specific act of omission or commission, by either party, is impracticable, and would lead to unsatisfactory results. Courts of admiralty have wisely applied the doctrine of comparative negligence or divided liability for injury sustained by collisions, and apportioned the damage and burden. This doctrine has been applied in cases of collision, not because it is logical, but because of necessity, or because it is more consonant with justice. While the practice had its origin in collisions, it has been applied in other cases.

In The Max Morris, 137 U. S. 1, 11 Sup. Ct. 29, 34 L. Ed. 586, its history and application is discussed by Mr. Justice Blatchford. He said:

"Some of the cases referred to show that this court has extended the rule of the division of damages to claims other than those for damages to the vessels which were in fault in a collision. * * * They show an amelioration of the common-law rule, and an extension of the admiralty rule in a direction which we think is manifestly just and proper. Contributory negligence, in a case like the present, should not wholly bar recovery."

While not strictly analogous, the reason of the thing leads to the same conclusion. The tendency to thus deal with similar conditions is seen in the Employers' Liability Act (Act April 22, 1908, c. 149, 35 Stat. 65 [Comp. St. 1913, §§ 8657–8665]). While in the strict sense of the term, neither party was guilty of wrongdoing—a tort—they were dealing with a condition produced, in part, by causes for which no one was liable—the elements, the sea, the winds, currents, and shoals. If the crew had not left the Alcazar, as they now insist was unnecessary, but few, if any, of the misfortunes which she sustained would have overtaken her. Their abandonment of the vessel in a sense, and to a degree, was the first act of an intelligent human agency, creating a condition, which produced results involving the crew of the Dorchester

in a difficult salvage service. Their absence from the vessel, in a measure, contributed to the loss of her two anchors; if they had remained or returned to her, as it seems they could have done by the same means used by Mr. Hassler, Beranger would not have found conditions which resulted in the loss of the anchors. Again, there is evidence that it was their duty to keep the kedge anchor in proper condition for use in case of an emergency. These are only illustrations of the numerous co-operating causes contributing to the final result.

Without extending the discussion, I am of the opinion that a division of the cost of repairing the vessel on account of recently sustained damage is, pro hac vice, approximately fair. This places the valuation as a basis for fixing the amount of award, so far as value is an element, at $38,420.17. The parties are as far apart in regard to the value of the cargo as of the vessel. Claimants have filed exhibits showing actual weight, value, etc., together with evidence of its value. Eliminating several items in regard to which there is controversy, I find that the value of the cargo was approximately $25,000 and the freight $7,155.81—making a total of $70,575.98. There is an irreconcilable conflict in the testimony in regard to the alleged spoliation and carrying away of articles from the vessel. I am inclined to the opinion that this has been exaggerated, both as to extent and amount. I am impressed with the belief that, in the hurry of leaving the vessel, and the uncertainty of their return, the crew of the Alcazar took away with them quite a large quantity of their personal belongings. It is certain that nothing of much value was taken away by the crew of the Dorchester, when they left the Alcazar at anchor, other than the mail packages which Capt. Chase delivered to the post office authorities. Counsel frankly conceded that no point was made in regard to this. I am unable to find that the four men who remained on her until January 1st took with them, or carried away before leaving, articles of much value. They, of course, used so much of the provisions on board as were necessary for their support. This they were entitled to do. It is evident that some feeling has been engendered between the witnesses in regard to this subject. The condition of the furniture, fittings, etc., found by Mr. Hassler, may be accounted for by reference to the heavy listing and rolling of the vessel for several days and her pounding with the rise and fall of the tide while aground, prior to December 31st, when he went on her. I see no reason for fixing liability for these conditions upon the crew of the Dorchester. While this conduct was improper, I am not inclined to attach much importance to it in fixing the award.

Complaint is made that both libelants made excessive demands for salvage and required large bonds. This is true, but the only information which counsel for the Merchants' & Miners' Transportation Company had, as to value, was furnished by the insurance agents of claimant, who put the value of the vessel and cargo at $125,000. It seems that counsel for the Columbia had practically the same information. At the time the libels were filed, none of the parties supposed that the cost of repairs would be so large. The evidence in regard to the Dor-

chester puts her value at $125,000, and the Merrimac at $110,000. I do not find any evidence of the value of their cargoes. The evidence tends to show that the value of the Columbia is about $50,000. Neither of the vessels sustained any injury, nor were any of their crew injured. Except in going on the Alcazar, on the night of December 24th, none of them were in serious danger of injury.

Counsel devote considerable portions of briefs to the citation of cases discussing the moiety rule in cases of derelicts. They do not seriously controvert the conclusion that the rule does not now obtain, and is not considered as controlling in fixing amount of awards. It is referred to in The Cato, Fed. Cas. No. 13,786, as "exploded." In the B. C. Terry (D. C.) 9 Fed. 920, it is said that in the early part of the last century (eighteenth) the correctness of a rule of fixed proportions began to be questioned, then discountenanced, and at length abandoned, and a flexible and more salutary rule was declared by the British admiralty, and approved and adopted in this country, by the Supreme Court of the United States, in Post v. Jones, 19 How. 150, 15 L. Ed. 618. The elements entering into a salvage award have been so frequently stated and so uniformly adopted that they need not be repeated. Judge Hale, in The Lyman M. Law (D. C.) 122 Fed. 816, says that Judge Hughes, in The Sandringham (D. C.) 10 Fed. 556,

"in a masterly and exhaustive opinion reviews the principles upon which cases of this character should be decided. * * * Embodying the result of the decisions of the English and American courts of admiralty, the Board of Trade laid down the rules to be considered in determining the amount of the award."

After naming six elements which the court should consider, he says:

"And Judge Hughes adds a seventh consideration: The degree of success achieved, and the proportions of value lost and saved."

It is in applying the last, and the one in regard to which counsel differ most widely, that I find most difficulty. As said by Judge Goff in The Haxby, 83 Fed. 715, 28 C. C. A. 33:

"The law relating to the question of salvage, as well as the rule by which the same is to be applied to the facts of any given case, has been repeatedly announced and illustrated in decisions of the Supreme Court of the United States. * * * It is hardly safe to make comparison of cases of this character, unless at the same time careful attention is given, and proper discrimination made, as to the facts and the special circumstances existing in each case."

While this is manifestly true, it is also true that such examination and discrimination discloses a fairly harmonious and orderly development of judicial thought on the subject and removes it from the field of arbitrary personal opinion. Like so many subjects in the domain of the common law, precedent "embalms a principle" and a rule of more or less safe general application is established. In The Lyman M. Law, supra, it is said:

"It is not necessary * * * to discuss the * * * question whether or not the schooner was a derelict, or to consider all the old learning upon the subject of derelicts. The question to be decided is in what peril the vessel was found, and what reward should be given for the services rendered by the

salvors. It cannot be doubted that the crew abandoned the schooner in great haste, in fear of their lives; the seamen taking with them their personal effects."

As said in The Great Northern (D. C.) 72 Fed. 678:

"Towing a disabled vessel on the high sea, owing to the latent danger from the multiform accidents to which ships are constantly liable is always a salvage service."

In the presence of wrecks, in the regular track of vessels, without lights, in the nighttime, especially in thick weather, with no one to give warning of their location, may justly alarm, for they are liable to occasion great loss of life and property. The ship salved was of about the same dimension as the Alcazar, valued at $100,000, and an award of $10,000 was made by Judge Hughes. The crew remained on the Great Northern.

In The Minnie E. Kelton (D. C.) 181 Fed. 237, the crew temporarily abandoned the vessel. Judge Wolverton says:

"The allowance of salvage is based upon two considerations—one, of public policy, which suggests a liberal bounty to induce vessels and water craft to turn aside from their regular course and endure the hardships and perils of removing dangerous wrecks from the pathway of commerce; and the other, to restore the wreck of disabled vessel to the owner, and the service which is adequately commensurate with the successful performance of the undertaking is * * * of high merit, and the award is therefore measured accordingly."

The value of the Kelton was fixed at $45,000. The cost to repair the damage sustained was $20,000. She had a cargo of lumber valued at $36,000. An award of one-sixth of the value, after deducting the cost of raising the vessel and repair, was made.

In The Apache (C. C.) 124 Fed. 905, Judge Brawley says:

"It is the policy of the maritime law to encourage spontaneous services rendered in going to the aid of a ship in distress by giving some remuneration beyond the value of the work actually done, as an encouragement to induce the salvor and future salvors to incur risk in saving life and property; but this extra remuneration is always proportioned, * * * and it is never the policy of the law, nor in accordance with justice, to allow a situation created by calamity to be converted into an opportunity for extortion."

The value of the tugs salved was fixed at $20,000 to $30,000 each, and an award of $1,500 each was made.

In The Edith L. Allen (D. C.) 139 Fed. 888, Judge Adams said that, while the schooner was not, strictly speaking, a derelict, she might justly be so considered for salvage purposes, her value was $25,000, an award of $8,000, with reimbursement for actual expenses, was made. In The Haxby, supra, the value of the property used in the service was about $117,000. The court gave an award of $16,666.

Judge Hughes, in The Sandringham, supra, said:

"The task of the wreckers was full of toil and risk, performed as it was on a dangerous coast, liable to sudden storms and sea swells. The work was bravely undertaken, perseveringly and faithfully pursued, and successfully accomplished."

The value of the vessel saved was $193,000. An award of one-fourth her value made.

In The Lamington, 86 Fed. 675, 30 C. C. A. 271, Judge Lacombe says:

"'Regard is always paid to the value of the property saved, and an award will not be made of such an amount as to deprive its owners of the benefit of the service, with the view of recouping to salvors their losses. It is one of the risks they run that they may not be indemnified for their sacrifices. It is said that the court of admiralty has hardly ever, and then only in the case of a derelict, awarded as salvage more than half the value of the property saved.' * * * That the compensation of salvors is subject to reduction, even below a fair quantum meruit, when otherwise nothing would be left for the owner, is a proposition approved in the opinions of the courts in the following cases, although in none of them are the facts exactly like those in the case at bar."

Following this language is a careful analysis of a large number of cases. While, for the reasons stated, and for the purpose of fixing approximately the value of the vessel and her cargo, they are fixed at the amount named, it is manifest that the owners received in actual value only about $13,840 in the Alcazar, and the owner of the cargo only about $23,000, which, with the freight, is approximately $45,000. An award will be made to the Columbia of $1,000 and her expenses, $1,033.63, and to the Dorchester and Merrimac of $10,000 and expenses incurred, $2,097.89. The cost of depositions will be taxed against the party taking them; that is, the cost of witnesses, commissioners, and stenographers. The balance of the cost will be taxed against the claimant. The question of apportionment of the award between the vessel and crews will be retained for further consideration; if not agreed upon, a reference may be taken.

A decree may be drawn accordingly.

⬿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes