## THE HAXBY.

### THE HAXBY v. MERRITT'S WRECKING ORGANIZATION.

(Circuit Court of Appeals, Fourth Circuit. November 3, 1897.)

#### No. 223.

1. SALVAGE—COMPENSATION—INCOMPLETE SUCCESS.
   The fact that a vessel which has gone ashore receives injuries in the course of the salvage operations, while it does not deprive the salvors of their claim both to compensation and bounty, is one proper to be considered in determining the amount of the award.

2. SAME—DANGER TO LIFE.
   In determining the effect on the amount of salvage of risk incurred in going through the breakers, the fact that a life-saving crew was in close proximity, and ready to effect a rescue in case of accident, is to be taken into consideration as affecting the degree of merit in facing the danger.

3. SAME—SALVING STRANDED STEAMER.
   Where a steamer stranded on the eastern shore of Virginia was rescued with comparatively little danger in about 3½ days, by the use of tugs and other appliances belonging to a wrecking company, and worth about $117,-000, operated by a crew of 24 men, *held*, that an award by the district court of $27,500 on a salved value of $100,000 was excessive, and should be reduced to $16,666.66⅔, or one-sixth of the salved value.

Appeal from the District Court of the United States for the Eastern District of Virginia.

This was a libel in admiralty by Merritt's Wrecking Organization against the British steamship Haxby to recover compensation for salvage services. The district court awarded to the salvors the sum of $27,500, and the claimants have appealed.

George Whitelock, for appellants.

Robert M. Hughes, for appellees.

Before GOFF and SIMONTON, Circuit Judges, and BRAWLEY, District Judge.

GOFF, Circuit Judge.    The libel in this case was filed February 11, 1897, by Merritt's Wrecking Organization, a partnership in the wrecking business, duly supplied with the equipments of the character required in such business, against the British steamship Haxby, in a cause of salvage.    The Haxby is a modern English steamer, with triple expansion engines, gross tonnage 3,445, net tonnage 2,252, built of steel, 330 feet long, 43 feet beam, 21 feet depth of hold, and is equipped with all modern improvements.    During the night of January 15, 1897, said steamer went ashore abreast of Dam Neck Life-Saving Station, on the eastern shore of Virginia.    There was no harbor in the immediate vicinity.    In going ashore, she had crossed the shoal, where there was less than 6 feet of water at low tide, although she was drawing from 12 to 15 feet.    At a distance of about 30 feet from the beach at low tide, she swung broadside to it, where she lay helpless, exposed to the action of wind and wave.    The next morning the libelants, having received information of the disaster, sent their steamer Coley to the assistance of the Haxby.    She arrived at the point where the distressed vessel was about half past 7 in the morning, and found the Haxby broadside on the beach, heading to the northward.    The Haxby was in a dangerous position, and, in order to save her, those in charge of the salvage operations took immediate steps to lay cables and anchors, which they succeeded in doing about 3 p. m. of that day, when the operation of hauling the ship was commenced.    During the day there was a heavy sea, and a moderate northerly breeze.    The work continued throughout the night of the 16th and the following day, the ship swinging to and fro, and surging heavily, on account of which the salvors found it necessary to lash the cables to the ship's bits to prevent her from going ashore, in case the tackle was carried away.    The steamer was now helpless, having broken her stern post and bent her rudder stock.    On the morning of the 17th, the salvors, finding other equipments necessary, sent the Coley to their station at Norfolk to procure the same,—including additional cables and anchors,—which were duly received, and the work continued during that day.    The Haxby's rudder in the meantime had been lost.    The salvors utilized the engines and winches of the Haxby in hauling on the cables.    Near noon on the 18th the large wrecking steamer J. D. Jones, belonging to the salvors, arrived at the wreck for the purpose of assisting in the operation of rescue, but she was unable, on account of the storm and the current, to render much assistance until about 3 p. m., when, by the use of a surf boat, another anchor and cable was laid, and the work of hauling on both cables then continued until about 8 p. m., when, because of the falling tide, it ceased until the next morning.    During the night the ballast tanks were pumped out, in order to lighten the steamer. Early in the morning of the 19th, the steamer was floated, and taken in tow by the J. D. Jones, the Coley being fastened to her stern, as her rudder was gone and her propeller disabled.    At about 3 p. m. of that day the Haxby was delivered at the dry dock at Newport News, and the vessels of the salvors reached their station at Norfolk about 5 o'clock.

The answer of the master of the Haxby was filed on the 18th of February, 1897, in which it was admitted that the salvors' services were rendered substantially as set forth in the libel, but it alleged that there was at no time while the Haxby was ashore any peril whatever to any of her crew, as they were near to the beach, and in constant communication with the men of the United States life-saving station, which was in the immediate vicinity, who would, in case of danger, have taken them ashore. The answer claims that all the injuries received by the Haxby occurred subsequent to the arrival of the salvors, and during the time they were endeavoring to float her, and that, therefore, the salvors' operations were not attended with complete success. The cost of the repairs to the Haxby on account of the injuries so received is stated as between $25,000 and $30,000. It is also set forth in the answer that the service which had been rendered by the salvors was in no sense unusually hazardous or dangerous, but that it and the risk encountered were simply those that all men engaged in the avocation of wreckers are constantly liable to. The libel alleged the value of the Haxby to be $150,000, while the answer states that the true value of said steamship in her damaged condition did not exceed from $80,000 to $90,000. The libelants claimed $40,000 for the services rendered by them in floating the Haxby, and towing her to Newport News; and her master, deeming said claim excessive, declined to pay the same, and consequently the libel was filed. The case came on to be regularly heard, the witnesses were examined in open court, and on the 17th of March, 1897, the court entered a decree finding the libelants' claim for salvage to be meritorious, and allowing for the same the sum of $27,500, with interest from January 19, 1897, and costs. From this decree the present appeal was sued out.

The appellants insist that the award made by the district court is excessive, and that it cannot be justified by the rules of law applicable to cases of this class. The meritorious character of the services rendered by the salvors is apparent; in fact, is not denied by the owner and master of the Haxby, who claim that they have always been ready and willing to pay a reasonable compensation for the same, but they insist that the allowance of $27,500 is shown by the testimony to be largely in excess of the sum that should be allowed. The services by the salvors commenced on the morning of the 16th of January, 1897, and terminated during the afternoon of the 19th of that month, thus consuming less than four days' time. The value of the property used by the salvors, and exposed to danger during the work, was about $117,000, and the crew employed numbered 24 men. Considerable skill was undoubtedly displayed by the salvors, but we do not find that the risk to life or property was either great or constant,—not other than that necessarily connected with work of that character. The services extended through parts of four days, but what may be called the really dangerous work was done during the two hours from 2 to 4 o'clock of the afternoon of the 16th. The rest of the services, while commendable in character, and performed with skill and energy, taking into consideration the equipment in use, was not of the character that brought with it imminent

risk to either life or property. While it is true that the salvors floated the stranded ship, and delivered it at the dry dock, still we do not find that their services were entirely successful, for the reason that the vessel was badly damaged when delivered, and it is clear from the evidence that such injuries were received after the salvors commenced their work of rescue,—a matter which, while it does not deprive them of the right to claim both compensation and bounty, is eminently proper to be considered in determining the amount of salvage they are entitled to. The value of the Haxby, as she was when delivered at Newport News, is of material importance in determining the allowance that should be made to the salvors. Four witnesses were examined as experts on this question,—two on each side. They differ materially as to the value of the ship; those offered by the libelants placing the same, one at $123,600, and the other at $119,334; and those offered by the respondent estimating the value, one at $85,000, and the other at $82,000. A close study of the testimony, and of the facts and circumstances on which the opinions of the experts are based, leads us to the conclusion that a fair and impartial valuation of the Haxby at the time she reached the dry dock at Newport News did not, at least, exceed $100,000, and therefore, in determining the question of salvage, we will regard that as her true value in her saved condition.

The law relating to the question of salvage, as well as the rule by which the same is to be applied to the facts of any given case, has been repeatedly announced and illustrated in decisions of the supreme court of the United States; and neither the discussion of the same nor the citation of authorities relating thereto is deemed necessary in disposing of this case. The cases cited and relied upon by the appellee, especially The Sandringham, 10 Fed. 556, and The Egypt, 17 Fed. 370, differ materially, so far as the facts are concerned, from the case we now have under consideration. It is hardly safe to make comparison of cases of this character, unless at the same time careful attention is given, and proper discrimination made, as to the facts and the special circumstances existing in each case. The dissimilar facts are generally so marked, especially those relating to value, time, risk, and skill, as to render the decision in one case an unsafe guide in another. In the case of The Sandringham the salvage service continued for a week, and the ship was in unusual peril, having been virtually abandoned by the master and crew, and left in charge of the wreckers. The wrecking company in that case employed a large number of men in the salvage operations, and, in addition thereto, a number of steamers, tugs, wrecking schooners, surfboats, and lighters were continuously used in the work. In addition, there was imminent and continuous danger to the lives of those so employed, as well as to the valuable cargo of the vessel. In that case the court allowed the salvors a sum equal to one-fourth of the value of the property saved. In the case of The Egypt, the ship went ashore in a snow storm; the weather was bad, and the sea rough, and the force of salvors, which was large, was employed for eight days. The circumstances, in some particulars, were like those of The Sandringham, and yet the court allowed a lower proportionate

award as salvage, granting on that account one-fifth of the value of the property saved. The case of The Kimberley, 40 Fed. 289, has also been called to the attention of the court, but it is easily distinguished from the case at bar. That ship was one of very great size. She was stranded 3,000 feet from deep water. Her engines were practically useless, and most of her crew had abandoned her. The salvors, using nine vessels, and a large force of men, were employed from December 1st to January 26th, during extremely severe weather, and with continuous risk to vessels and men. Her valuable cargo was moved in surf boats, and the effort to save it, as well as the ship, was attended with perfect success. The salvors in that case were allowed one-fifth of the saved value of the property, together with a quantum meruit allowance for money expended for chartered vessels, and as compensation to the salvors for their own property. An appeal was taken because of the amount of the salvage award, but, the matter being subsequently compromised, the case was not decided by the appellate court.

There is some conflict in the testimony as to the condition of the sea, and the character of the storm, but it is quite evident that there was no such extraordinary peril existing at the time the work was going on as endangered the lives of either the crew of the Haxby or of any of the salvors, if the precaution usually practiced on such occasions was observed. It seems that the crew regarded themselves as perfectly safe, and the master testified that they could have gone ashore by means of a ladder. There was at one time considerable danger to those of the salvors who went through the breakers to the shore, when the operations looking to the rescue of the Haxby were commenced. But it should be borne in mind, as Capt. Nelson, who had charge of the surf boat at that time, states in his testimony, that the risk was taken because of their close proximity to the life-saving station, the crew of which, then on duty, had full view of what was transpiring, and would have gone to the assistance of the wreckers if their services had been needed. The act of the salvors in that particular, and, indeed, throughout the work attending the rescue of the Haxby, was courageous and commendable, and will not be overlooked by the court in connection with the award for salvage. Considering the degree of danger to life and property, to which we have already alluded, and the value of the property saved, which we have found to be $100.000; keeping in view the value of the property used by the salvors, the risk to it, the number of men employed by them, the time of their employment, and the skill shown by them,—we are of opinion that an allowance of one-sixth of the value of the property saved will be, under the circumstances of this case, fair to the salvors and just to the owners of the ship, and therefore we find the sum due Merritt's Wrecking Organization, the libelants, on account of salvage from the steamship Haxby, to be $16,666.66 2/3, instead of the sum of $27,500, allowed in the decree of the court below. The decree appealed from is modified as indicated, and this case is remanded to the district court of the United States for the Eastern district of Virginia, with instructions to proceed in accordance with this opinion.