BERGHER et al. v. GENERAL PETROLEUM CO. et al.

(District Court, N. D. California, First Division. May 23, 1917.)

No. 16153.

1. SALVAGE ☞18—COMPENSATION—RIGHTS OF CREW.

The right of the crew of a salving vessel to compensation for salvage services cannot be destroyed by any contract between the owners of such vessel and the owners of the vessel salved.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 31–43.]

2. SALVAGE ☞36—COMPENSATION—RIGHTS OF CREW.

Contracts between the owners of salved and salving vessels, fixing the amount which is to be paid for the salvage service, are binding upon the parties, but not upon the crew of the salving vessel, unless they assent to it. If the amount agreed upon is reasonable payment for the entire service, the salvor receiving it may be compelled to distribute to the crew their just proportion; but the crew are not bound to look to him, but may look to the salved vessel and its owners.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 85–91.]

3. SALVAGE ☞23—COMPENSATION—RIGHTS OF CREW—EFFECT OF CONTRACT BETWEEN OWNERS.

A steamer became disabled 60 miles off the coast of Mexico, because of dirt and water in her fuel oil, and could not make steam. She called by wireless to her owner in California, who sent a tug to her assistance; but for some reason it did not find her. Two days later the owner contracted with another vessel in San Francisco to go to her relief and tow

---

her to San Pedro, for which it agreed to pay an agreed sum per day and fuel cost; the amount being no more than the actual value of the use of the vessel at charter rates. The disabled vessel was found, after she had drifted for 4 days and was within 10 miles of the coast, and was towed to San Pedro and the agreed compensation paid. *Held*, that the service was not one of towage merely, but of salvage, and that the crew of the salving vessel, who had signed on for a voyage, were entitled to recover from the owner of the salved vessel half a month's wages for their part in the service.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 53, 54.]

In Admiralty. Suit by C. Bergher and others against the General Petroleum Company and others. Decree for libelants.

F. R. Wall, of San Francisco, Cal., for libelants.

A. L. Weil, of San Francisco, Cal., for libelee.

Ira S. Lillick, of San Francisco, Cal., for J. R. Hanify and others.

DOOLING, District Judge. On August 1, 1915, the steamer Mills, under charter to respondent General Petroleum Company, became disabled while off the west coast of Mexico because, owing to dirt and water in her fuel oil, she was unable to make steam. In this condition she drifted with the wind and current at the rate of about a mile an hour until August 5th, when she was picked up by the steamer Francis Hanify and towed to San Pedro. During the four days before she was picked up she drifted from a position about 60 miles from shore to a position about 10 miles off shore. On August 1st her master sent the following message to San Pedro:

"Owing to dirt and water in fuel oil, engineers cannot furnish steam to proceed and hold out no hopes. They say fires may go out at any time, putting wireless out of commission. You will have to arrange to tow ship in. Our position is lat. 30° 15', long. 117° 03'."

On the same day respondent Petroleum Company replied:

"We are sending towboat from San Diego, having given them your position."

Later, but apparently on the same day, respondent sent the following:

"Towboat left San Diego at 6 p. m., owned by Spreckels Company. Accept other assistance. Have towboat proceed with steamer to San Pedro, not San Diego. Wireless your position often."

On August 2d respondent sent the following:

"Confirm receipt of wires concerning dispatch of towboat. Tug should reach you this afternoon."

To this the Mills replied on the same day:

"Your message received concerning towboat. Current and wind setting us one mile per hour from last position to S. S. E. magnetic."

Thereafter, and on the same day, at 1 p. m., the Mills sent the following:

"Position S. S. Mills 11:15 a. m. lat. 29° 51', long. 117° 16'."

And at 5:07 p. m. she sent the following:

No towboat in sight. Position at 4 p. m. lat. 29° 44' north, long. 116° 53' west. Drift one-half mile S. S. E. per hour. What towboat has come, and has she a wireless?"

Why the tug sent out did not find the Mills does not appear. On August 2d the steamer Francis Hanify left San Francisco for San Pedro, there to take on a cargo of fuel oil for Tocappila, Chile. Her crew shipped at San Francisco under this agreement:

"Office of the United States Shipping Commission, for the Port of San Francisco, California, August 2, 1915. It is agreed between the master and seamen, or mariners, of the steamer Francis Hanify, San Francisco, California, of which F. D. Zaddard is at present master, or whosoever shall go for master, now bound from the port of San Francisco, California, to San Pedro, California, to Arica, Chile, or such other ports as the master may direct, on the west coast of South America, thence to New Orleans, Louisiana, and such other ports and places in any part of the world as the master may direct, and back to a Pacific Coast port, with final discharge in the United States, for the term of not exceeding twelve months."

On the arrival of the Hanify at San Pedro, her master was directed by her owners to take on sufficient oil for the purpose and proceed to the Mills and tow her into San Pedro. This was in pursuance of a contract made at San Francisco on August 3d, between the General Petroleum Company and the owners of the Hanify. According to the former, the contract was that the Petroleum Company agreed to pay $400 a day for the time consumed and to reimburse the Francis Hanify for the value of the oil used, and for this the Hanify was to proceed to the position of the Mills as reported by wireless and tow her into San Pedro. As stated by the owners of the Hanify, the contract was that the Petroleum Company was to pay them $400 per day for the time consumed, and to reimburse them for the value of the oil used in the service of towing the steamer Mills, and the Hanify Company agreed to send the Francis Hanify out from San Pedro, and pick up the Mills, and tow her back to San Pedro for that compensation. Under either version, the finding of the Mills and the towing of her into San Pedro would seem to be essential to a claim for payment. Pursuant to the agreement, the Hanify found the Mills and towed her to San Pedro, the time consumed being three days and four hours, for which the Petroleum Company paid the owners of the Hanify the amount agreed upon; that is to say, $1,266.66. In addition, they paid $323.12 for the oil consumed, making a total amount paid of $1,589.78. No agreement was made with the crew of the Hanify, nor was anything paid to any of them for the services that were rendered to the Mills, except their regular wages.

This action was brought by some of the crew, in behalf of themselves and all others interested, against the owners of the Francis Hanify and owners of the Mills; the libelants claiming that the services rendered to the Mills were salvage services, and asking for a decree that the court fix the value of such services in the lump sum of $7,500, and direct the owners of the Hanify to account for the amount received by them, and that the owners of the Mills be compelled to pay into court the remainder for the benefit of those entitled thereto. Both respondents answer, setting up the fact that the services rendered were purely towage services, that their full value has been paid, according to the agreement, and that the crew of the Hanify are not entitled to any extra compensation beyond their wages for anything done by them in

the premises. The libel was filed February 2, 1917. The value of each of the vessels was at the times mentioned $200,000.

The case thus presented is an interesting one, and the principles that should govern its determination are very important, involving, as they do, the rights of the crew of the Hanify to recover for salvage services, if these were such, and the rights and obligations of the owners of the Hanify and Mills under the contract between them, already fully carried out by each. Yet the governing principles do not seem to me to be at all obscure.

[1] In the first place the rights of the crew of a salving vessel to compensation for salvage services cannot be destroyed by any contract between the owners of that vessel and the owners of the vessel saved. Indeed, the law is so tender of their rights that it makes void any assignment by seamen of salvage made prior to the accruing thereof. If the seaman himself cannot by agreement deprive himself of the right to salvage prior to its accrual, certainly no contract between other parties can deprive him of that right.

[2] In the second place, contracts between the owners of the salved and salving vessels are binding, but binding only on the contracting parties. The owner of a salving vessel may by agreement fix the amount which is to be paid to him for salvage services, and this agreement will be enforced. But such agreement cannot bind his crew unless they assent to it. If, however, the amount received by him under the agreement is a reasonable compensation for the full salvage service, including the services of the crew, he may be compelled to distribute to the crew their proportion of such amount. The crew, however, are not bound to look to him for their reward, but may look to the salved vessel and its owners, for neither the agreement of the owners nor the payment of the money is binding on them without their assent thereto. If it were, the owners would always have it in their power to defeat the rights of the crew by fixing the amount to be paid at such a trifling sum as to make it impossible for the crew to receive any commensurate reward, even if the whole sum agreed upon were distributed among them. If the owner of the salved vessel shall have paid to the owner of the salving vessel the full value of the service, including the service of the salving crew, and is thereafter called upon by the crew to answer to them, I am confident that under the general admiralty practice he could bring in the owner of the salving vessel to answer jointly with himself, and the rights of all the parties could be adjusted in the single action.

[3] Applying these principles to the case at bar, I am of the opinion that the service performed was a salvage service, and not merely one of towage. The Mills was disabled, drifting at the mercy of the winds and currents, and had so drifted for four days before she was picked up. In that time she had drifted to within 8 or 10 miles of the shore, from a position 60 miles distant therefrom. Her first telegram announced the danger of her wireless becoming unserviceable. The tug first sent to her relief had for some reason not found her. I think these facts stamp this as a salvage service within well-recognized rules. That both respondents unite in calling it a towage service is

not really of much moment as affecting the rights of the crew. But it is in evidence that the owners of the Hanify received for this service under their contract no more than the actual value of the use of their vessel at her charter rates. This being so, it cannot be said that there was included in the amount received by them any compensation for the salvage services of their crew for which they should be held to account to them. The crew, therefore, must in this action look for their compensation wholly to the General Petroleum Company. In a somewhat similar case (The Roanoke, 209 Fed. 114) this court allowed one-half month's pay to each of the crew of the salving vessel. The Circuit Court of Appeals, while not disturbing the award, declared it to have been very liberal. I am disposed, however, to make the same award in the present case, but only to the actual libelants.

The prayer for a lump sum will be denied, but to each of the crew who has appeared herein will be awarded one-half month's wages, with costs, the decree to run against the respondent General Petroleum Company only.

Let such decree be prepared.