## MARU NAV. CO. v. SOCIETA COMMERCIALE ITALIANA DI NAVIGATION.

(District Court, D. Maryland. February 28, 1921. Supplemental Opinion, March 21, 1921.)

1. **International law** ⟨⟩10—**Vessel under requisition by foreign nation not exempt from attachment.**

   A vessel *held* not immune from foreign attachment in a suit in personam against the owner, because she was at the time under requisition by and in the actual possession of the Italian government.

2. **Salvage** ⟨⟩23—**Owner liable in personam for salvage services.**

   The owner of a stranded vessel, who retained and used her after she was released, *held* liable in personam for salvage services rendered in effecting such release on request of her master.

3. **Salvage** ⟨⟩18—**That vessels were in company does not defeat claim by one for salvage of the other.**

   That two vessels sailed for a distance in company during danger from submarines, because one was armed while the other was not, but without further agreement, *held* not to defeat a claim of the unarmed vessel for salvage services rendered to the other when stranded.

4. **Salvage** ⟨⟩36—**Payments to master and crew not bar to suit.**

   Payments made by the owners of a vessel to which a salvage service had been rendered to the master of the vessel rendering the service, to be divided between master and crew, which payments were not reported to the owner, nor intended to be, the purpose being to prevent any claim for salvage, *held* not to bar suit for salvage by the owner.

---

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**5. Salvage ⬥30—Award for releasing stranded vessel.**

An award of $34,000, made to a steamship for service rendered in pulling off a stranded vessel, with freight for the voyage, $320,000, which was released without injury after 39 hours; the vessels being in no particular danger, except from submarines, the danger from which was serious.

In Admiralty. Suit by the Maru Navigation Company against the Societa Commerciale Italiana di Navigation. Decree for libelant.

John Henry Skeen, of Baltimore, Md., and Loomis, Barrett & Jones, of New York City, for libelant.

Whitelock, Deming & Kemp, of Baltimore, Md., and Barry Wainwright, Thacher & Symmers, of New York City, for respondent.

ROSE, District Judge. [1] The instant proceedings were instituted in August, 1918, by the filing of a libel against the respondent, in personam, with a clause of foreign attachment, under which the steamship Armando was arrested. Both the Italian consul and the ambassador of Italy made separate, but substantially identical, suggestions to the court that the Armando was immune, because it was at the time under requisition to the government of Italy, and in the actual possession of that government. As neither of these suggestions came through our State Department, I declined to consider them as evidence upon the question of fact involved, and for that view may now be cited the recent decision of the Supreme Court. In re Muir, Master of the Gleneden, 254 U. S. ——, 41 Sup. Ct. 185, 65 L. Ed. ——.

When the ship was attached, I was out of the district, and an immediate hearing upon its validity could not readily be had. It was of vital importance that the sailing of the ship should not be postponed, and accordingly respondent arranged that the ship should be stipulated for. All parties, with the approval of the court, agreed that the filing of the stipulation should not in any wise waive her claim for immunity, and that, if the latter was sustained, the stipulation was to be thereby vacated.

From the oral and documentary evidence submitted, it appears that at the time of her arrest the relation of the Italian government to the ship was substantially that sustained by the same government to the Attualita. 238 Fed. 909, 152 C. C. A. 43. The fact that the Armando had an Italian army officer on board, whose usual duties were those of a supercargo, but who could take actual command of her in certain contingencies, which did not happen, is a distinction which does not appear to me to amount to a legal difference. It is true that here the ship was not arrested for its own fault, as the Attualita was, and that in consequence some of the reasons of policy which made the Circuit Court of Appeals for this circuit there hesitate to sustain the claim of immunity, which would have freed her from responsibility for her own wrongs, do not exist here; but after all what was decided there was that the interests which the Italian government had in her were

not of such a character as to make her immune to the processes of our courts. What has since been said by the Supreme Court (In re Muir, supra) leaves the authority of The Attualita, supra, as yet unshaken. It follows that the Armando was properly attached, and that the merits of the case raised by the libel must be passed upon.

Early in June, 1917, two steamships, one the St. Charles, an American, and the other, the Tea, an Italian, were at Gibraltar. Both were bound for Genoa. The Tea was much the larger of the two, and carried one gun. The St. Charles was unarmed. For that reason the naval authorities directed them to cross the Mediterranean in company.

During the first part of their trip they kept in Spanish territorial waters as much as possible, in the hope of thereby minimizing the danger of submarine attack. About quarter of 5 on the morning of June 10th the Tea, when about a mile off shore, went aground, and was unable to extricate herself. The St. Charles was at the moment about a half mile astern, and came promptly up. The Tea sent an officer on board her to ask for help. Arrangements to give it were at once made. The St. Charles put out an anchor. A hawser was gotten from one ship to the other; but, as the St. Charles was about to begin pulling upon it, she found herself aground, carried there, as is suggested, by a local current, of the existence of which her navigators were unaware. It was some three hours before she got herself off.

About 1:30 a hawser was again made fast to the vessels, but it parted in about 15 minutes after strain was put upon it. It took all hands on the St. Charles some time to get their ship ready to try again. This time the line was so arranged as to make it in effect four. It was carried through the bitts on the St. Charles, and then to its mainmast. It was about a quarter of 6 in the afternoon before all these arrangements were completed, and then for an hour and three-quarters the St. Charles pulled as hard as she could. At half past 7 the approach of darkness made it prudent to suspend. The next morning work began again, but at quarter of 9 the St. Charles pulled out her bitts and did some damage to the deck planking, to which they were attached. The line was then secured to her mainmast, and the effort to free the Tea was resumed.

During the day, a Spanish sailing vessel of about 300 tons anchored close to the two ships, in a position in which there would be danger, both to herself and the Tea, if the latter should come suddenly off. She was asked to change her anchorage, but she would not, or at all events did not. The Tea finally began to move, at first slowly, and then much more rapidly, about 7:25 on the afternoon of the 11th, a little less than 39 hours after she took ground. A collision between her and the Spaniard was imminent, and was avoided by the exercise of quick judgment and skillful seamanship of the St. Charles, at the cost, it is suggested rather than proved, of some little permanent damage to her windlass or its connections, and there is some claim that

the engines upon the St. Charles suffered somewhat from the strain of the prolonged pulling.

The two steamships then resumed their voyage to Genoa, at which port they arrived on Saturday, the 16th of June, without further incident. On the 18th, the agents of the Tea gave the master of the St. Charles 35,400 liras, the equivalent at the then rate of exchange, of $5,000 in our money. In the letter inclosing this sum, the master of the St. Charles was asked to distribute it among his officers and crew for the services rendered the Tea. The signature of the master and his second officer at the foot of the letter acknowledged receipt of this sum.

The master of the St. Charles said he turned the $5,000 over to a committee of his officer and crew for distribution. He testified that, without suggestion from him, this committee awarded him, as nearly as he can recall, some $1,600 of it. The first officer admits that he received $500. Some of the seamen, who have been examined as witnesses, got $100 each. Precisely how the remaining $2,800 was disbursed he does not exactly remember. The captain says he understood that everybody on board, except the men in the steward's department shared in it. The steward's company were ignored because, according to the master, they had no hand in the salvage service, a proposition to which it is perhaps unnecessary to say they do not agree. There is reason to believe that there were other omissions.

Apparently on the same day on which this $5,000 was given by the agents of the Tea, they handed the master of the St. Charles an additional $8,000, and presented him with a handsome gold watch, marked "To Capt. Charles Lyman, for his brave and friendly assistance to S/S Tea, Genoa, 18—6—17." While they had the receipt of both the master and second officer for the $5,000, they took from the former an acknowledgment for the entire $13,000, expressed to be "in full settlement of the services rendered to their S/S Tea off the Spanish coast, and slight damage suffered by my steamer." In point of fact, no part of the $13,000 was used in repairing the damage done. The agents of the Tea sent men on board the St. Charles to do the needed work, and paid them themselves. The master of the St. Charles never gave either her owners or the ship's company any of this $8,000, nor did he tell any of them of it. He sent $7,000 of it home to his wife in this country, and, significantly enough, gave the remaining $1,000 to the master of the Tea. He says the latter payment was in pursuance of an agreement he had made when the Tea was aground. Just why he entered into any such arrangement he does not explain. There is high authority that skill and gallantry of a naval officer, displayed at or after an attack upon his ship, may deserve the highest decoration it is possible to give, despite the fact that his ship was lost; but, so far as I am aware, a merchant captain has never before been supposed by any one to be entitled to a substantial pecuniary reward for letting his ship get aground and having somebody else pull it off.

The owners of the St. Charles heard nothing of these matters until, upon the return of their ship to this country, some of her crew complained that they had not received a share of the $5,000. Further investigation followed, as well in the United States as in Italy. The first replies of the Genoa agents of the owners of the Tea to the inquiries made on behalf of the St. Charles were, to say the least, reserved and incomplete. While efforts to ascertain the true facts were going on, the Tea made a couple of trips to the United States, and finally in the Mediterranean fell a victim of an enemy submarine.

There seems to be little, if any, reason to doubt that the agents of the owners of the Tea, very possibly at the interested suggestion of her master, made up their minds to get rid of any possible salvage claim, by making it to the advantage of the master and other persons on board the St. Charles to say little or nothing about the matter. Perhaps they at first supposed that $5,000 would suffice. If so, the master of the St. Charles was of another mind, and speedily convinced them that it would be well to pay the extra $8,000. In spite of the wording of the receipt they took from him, it is not likely there was much expectation that any wind of it would come to the owners of the St. Charles. The fact that $5,000 of it had been given to the officers and crew of the St. Charles indicated strongly that the agents of the Tea were not really making the payment to the master as such, in settlement of a salvage service. If that had been their purpose, they would not have themselves assumed to apportion the amount between the St. Charles and her company. That was something with which they would have nothing to do whatever.

The receipt, as already mentioned, was in another respect incorrect. According to it, the repairs to the St. Charles were to be paid for out of the $13,000. It is clear that neither the agents of the Tea nor the master of the St. Charles ever intended that this should be done. The facts being as they are, the respondents nevertheless contend (1) that for such a salvage service, if it be one, recovery can be had in a proceeding in rem only, and that this is especially true, now that the thing saved has perished. (2) That the relation of the two ships was such that the St. Charles was bound to do what she did, and is not entitled to any reward for doing it. (3) That the master of the St. Charles had authority to settle the salvage claim, and did so. These contentions will be considered in the order in which they have been stated.

[2] Is the owner of the Tea liable in personam? In England the question is settled adversely to the contention of the respondent. The Cargo ex Port Victor, L. R. [1901] Probate, 243. That case has been expressly cited with apparent approval by the Supreme Court in U. S. v. Cornell Steamboat Co., 202 U. S. 184, 26 Sup. Ct. 648, 50 L. Ed. 987. The liability has been here often enforced, sometimes without objection or comment, nor has it been denied in any case with which I am familiar when the services were rendered at the request of the owner or his agent, or where the saved thing came afterwards into the beneficial possession of the owner, or when he obtained and

retained some profitable interest in it, or when he threw obstacles in the way of the salvors asserting their rights in rem. Any one of these conditions has been more than once held or assumed to be sufficient to sustain a libel in personam. Bergher v. General Petroleum Co. (D. C.) 242 Fed. 967, Baxter v. Heilner (D. C.) 38 Fed. 668; Brevoor v. The Fair American, 4 Fed. Cas. 71, Fed. Cas. No. 1,847; Hudson v. Whitmire (D. C.) 77 Fed. 846. The fact that the salved ship was sunk after it had, subsequent to the salvage service, made two voyages across the Atlantic, for the profit of its owner, does not affect the right of the salvors to demand compensation.

Reliance is placed by the respondent on The Carl Schurz, 5 Fed. Cas. 84, No. 2,414. There Judge Hammond said:

"A salvor, in the view of the maritime law, has an interest in the property; it·is called a lien, but it never goes in the absence of a contract expressly made, upon the idea of a debt due by the owner to the salvor for services rendered as at common law, but upon the principle that the service creates a property in the thing saved. He is to all intents and purposes a joint owner, and if the property is lost he must bear his share like other joint owners."

As applied to the facts then before the court, this language is both apt and accurate. There the saved ship was raised by the salvors in a damaged condition, and 10 or 15 days later, while still unrepaired, was arrested at their instance, and sold by the marshal. The value received at this sale, less the expense, was obviously all that was saved for the owner, and was necessarily the basis of any estimate of what the salvage services were worth to him. Judge Hammond had not in mind a case in which, as the result of the action of the owner, the salvor was unable to assert his lien in rem until after the loss of the ship, which, in the meanwhile, had been gainfully employed in its owner's business.

[3] Was the St. Charles entitled to salvage? No one may claim a salvage reward for doing what he is legally bound to do, and for which he is actually or constructively compensated in other ways. At times there has been a custom for ships trading in particular parts of the world to sail in company for mutual protection, under an agreement that they would assist each other without becoming entitled to any compensation for so doing. The Zephyr, 2 Hagg. Adm. 43; The Harriet, 1 W. Rob. 439. But, in such cases, that there is such an intent must be proved as a matter of fact. No evidence of its existence is here forthcoming.

[4] Did the payments to the master of the St. Charles settle its salvage claim? The advocates have learnedly discussed under what circumstances the master of a ship has authority to adjust its claims for salvage. The Inchmaree, L. R. [1899] Probate, 111, distinctly holds that a shipmaster has no implied authority to bind his owner or his crew by an agreement as to salvage compensation for services already rendered. The persuasive force of the reasoning in that case is but little impaired by what Judge Longyear said 24 years earlier in The Senator, 21 Fed. Cas. 1077, No. 12,664. That was simply a towage case, in which the master had certified to the reasonableness of the

tug's bill. The general rule unquestionably is that the master, as to services to be rendered and when immediate decision is necessary, may on his own behalf, and as agent by necessity for his owner and crew, agree as to the terms upon which the aid will be given, and that such contract is binding; but after the work is done, and there is time to consult the other parties, he may not bargain their rights away, nor, for that matter, may any one or·two of the three without the assent of the others. Bergher v. General Petroleum Co. (D. C.) 242 Fed. 967.

In this case, however, all discussion of the master's power to bind his owner and his crew is beside the mark. His right, when it exists at all, depends upon the belief of the persons with whom he is dealing that he is, to the best of his judgment and ability, looking after the interests of those for whom he assumes to speak. If those who are contracting with him know that he is not in good faith trying to protect those for whom he assumed to be agent, they cannot rely on any arrangement he may make for them. Leathem v. The Roanoke (D. C.) 50 Fed. 574, may do as well as any other case as an authority for the doctrine applicable to all contracts on land or sea. In the instant case, there is no room to suppose that the agents of the Tea could have believed that the master of the St. Charles was seeking to protect his owner.

[5] The only remaining question is as to the amount to which the St. Charles is entitled. The Tea and her freight for the voyage may be taken as worth not less than $320,000. Had she been an entirely free ship, her value would have been much greater. When aground, she was in no particular danger from the elements, unless a severe and prolonged storm came on, which event at that season of the year was not probable. The submarine danger was serious. The commander of one of the undersea boats might or might not have respected the neutrality of Spanish waters; but, if he learned that the steamers were aground, it would have been the easiest thing in the world to lay in wait for them outside the three-mile limit. The risk run by the St. Charles in staying by the Tea was a good deal more serious than she would have incurred had she sailed alone to Genoa. The work she did was not great, but it entailed the possible risk of serious stranding. Her salvage operations seem to have been carried on with skill and energy. No other help was presently available or at hand. The fact that the St. Charles was sailing in company with the Tea is a circumstance to be taken in account as a moderating feature in any allowance that may be made. The Trelawney, 4 Red. 223; The Collier, L. R. 1 Arm. Ecc. 83.

On the other hand, the extremity of the peril, and the amount of the award, which might reasonably be allowed for the services rendered, was better known and could be more accurately measured at the time by the saved ship than it can be now and here. In the hope of escaping such an award as a court would make, the Tea was then willing to make an irregular payment of $13,000, taking the chance of losing some part

of it if the owners of the St. Charles ever found out the real facts and instituted proceedings. Men do not take such chances, unless they expect to profit largely by success.

I think that an award of $34,000 for the salvage service would be just. Of this, three-fourths should go to the owner, and this amount the respondent should pay without deduction. The one-fourth, or $8,500, remaining should go to the master and crew. Ordinarily I should allow the master, who took the responsibility of deciding that the salvage service should be rendered, an extra allowance, say of $850. I shall allow the first officer, whose services were of unusual value in this case, $500. This leaves $7,150 to be apportioned among the master and crew in the ratio of their respective wages.

But the master has already been paid by the respondent all to which he is entitled, and far more. Certain members of the crew have received out of the first $5,000 paid by the respondent certain sums, and they are not entitled to collect them again. The respondent may therefore deduct from the amount of the $34,000 the captain's share as above set forth, and the moneys already received by each of several members of the crew, to an extent not exceeding the amount to which such member will be entitled, according to the method of apportionment herein provided. In short, the amount which the respondent should have paid to the master and to each member of the crew is to be determined in the manner herein stated. The master and some members of the crew have received something from the respondent already. The respondent will be entitled to credit, against the sum any individual may be entitled to demand, whatever sum said individual has already received from it.

Under all the circumstances of this case, I think the awards should bear interest from November 1, 1917, and the respondent should pay the costs.

### Supplemental Opinion.

The respondent has suggested that, in addition to all else it conceives to be wrong in the aforegoing opinion, the allowance of interest from November 1, 1917, is error. Except when, as in Great Lakes Towing Co. v. St. Joseph-Chicago S. S. Co., 253 Fed. 635, 165 C. C. A. 261, the salvage award is based upon contract, it is seldom liquidated until the decree is entered, and respondent claims that interest may not be allowed upon unliquidated damages.

At law that is true in some jurisdictions, although not in all. Stephens v. Phœnix Bridge Co., 139 Fed. 248, 71 C. C. A. 374. But in admiralty and in equity, the rule is usually more elastic. The Ada (D. C.) 239 Fed. 372. More than 30 years ago the Supreme Court, in a collision case, said that the allowance of interest was within the discretion of the trial court. The Maggie J. Smith, 123 U. S. 349, 8 Sup. Ct. 159, 31 L. Ed. 175.

It is true that it appears that, according to the original practice of the English Admiralty, interest was not allowed in salvage cases. Jones Bros., 3 Asp. M. C. 478. But the Circuit Court of Appeals for

the Fifth Circuit held that in this country, in the sound judicial discretion of the court, it may properly be given. Texas Co. v. Texas & Gulf S. S. Co. (C. C. A.) 263 Fed. 868. There appears to be no American authority to the contrary.

All that was decided is this circuit in The Haxby v. Merritts' Wrecking Organization, 83 Fed. 720, 28 C. C. A. 33, was that the trial court may not modify a mandate of the Circuit Court of Appeals. Ordinarily there is room for real and wide difference of opinion as to what the service is worth, and there is usually little cause why interest should be allowed, but there is nothing inflexible about the rule. Its application will be controlled by circumstances.

In this case, the respondent endeavored to keep from the libelant knowledge that any service has been rendered. The last hearing in open court was on the 22d of December, 1919. The amount of the salvage which would be decreed, if any properly could be, was then announced from the bench, and it was also said that interest would be allowed from November 1, 1917, a date 4½ months after the Tea was pulled off the strand, a time ample for an ascertainment of the amount of salvage justly due, had it not been for the peculiar practices of the respondent. No formal opinion was then filed, and no formal decree was entered, because it was obviously expedient to await the decision of the Supreme Court in Re Muir, supra. Often the allowance of full legal interest will be a hardship on whoever is to pay it, for money may be worth much less to him, but in the last 4 years that has been very seldom true. It is more than probable that, even with the added interest, the respondent is better off, and the libelants in worse case, than they would have been, had the payment been made within a reasonable time after the work was done.

In view of all the circumstances, I see no reason to modify the conclusion heretofore announced.